BENJAMIN B. WAGNER
United States Attorney
MICHAEL D. ANDERSON
MATTHEW G. MORRIS
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>CHARLES HEAD, ET AL.,<br><br>　　　　　　　Defendants. | CASE NO.  2:08-CR-093 KJM<br>　　　　　　　2:08-CR-116 KJM<br><br>GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO CHARLES HEAD'S OBJECTIONS TO THE PSR<br><br>DATE: September 3, 2014<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

## I.　　INTRODUCTION

The PSR correctly calculates that Charles Head's offense level is 47—four levels above the highest level on the sentencing table.  This offense level is not an anomaly; it is an example of the guidelines capturing the true extent of the harm Head caused.  Head's guidelines range, which would be life if the maximum statutory penalty was not 180 years, is increased by nearly every sentencing enhancement that the sentencing commission uses to measure the seriousness and the harm of a fraud scheme.  Head victimized hundreds of people.  He specifically targeted the financially vulnerable at their time of greatest distress.  He stole their largest and most important asset, he caused tens of millions of dollars in damage, and he recruited and directed others in his scheme who had otherwise led law-abiding lives.  The damage caused by Head as heard at trial, and as described in the PSR, supports a sentence that is much greater than imposed on the vast majority of defendants in this case and in this country.  Probation is recommending a 150-year downward variance to a 30-year sentence for a

GOVT. SENT. MEMO. -- CHARLES HEAD　　　　　　　1

defendant who has no redeeming virtues and offers no facts in mitigation. The government respectfully disagrees and recommends a 40-year sentence in each case to be served concurrently.

Against these facts, Head offers only one mitigating factor, the same factor identified in the PSR—30 years, or 40 years, or 180 years is long time. It is. But 40 years is the appropriate sentence in this case where nothing will make Head's victims whole and where nothing else can protect the public from future crimes.

## II. GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

### A. The PSR Correctly Combines Relevant Conduct from the Two Cases

The PSR correctly considers Head's conduct in cases 2:08-cr-093-KJM and 2:08-cr-116-KJM together because that conduct is required to be grouped under the guidelines.

Certain offenses, including mail fraud, are grouped under U.S.S.G. § 3D1.2. U.S.S.G. § 3D1.2(d) (stating that offenses covered by guidelines § 2B1.1 "are to be grouped under this subsection"). This grouping applies, even if the multiple counts of conviction are from different indictments, if the sentences are to be "imposed at the same time or in a consolidated proceeding." U.S.S.G. § 3D1.1 n.1(B). To then determine the offense level of counts that have been grouped pursuant to U.S.S.G. § 3D1.1(d), "the offense guideline applicable to the aggregate behavior is used." U.S.S.G. § 3D1.3(b) and n.3.

In the present case, Head's counts of conviction from the two indictments group because they are fraud offenses covered by Guideline § 2B1.1. *See* U.S.S.G. Appx. A; U.S.S.G. § 3D1.2(d). Furthermore, the offense level for the two offenses is determined by aggregating the conduct in the two cases as required by U.S.S.G. § 3D1.3(b) and n.3. The PSR correctly performs this calculation. PSR ¶¶ 9, 17, 31. Moreover, given the overlapping nature of the offense level determination, the background of the defendant, and the need for the Court to efficiently handle this matter, there is no reason that these calculations cannot be contained in a single PSR. In particular, this PSR has taken care to identify conduct related to each case separately, which will allow for effective appellate review. In fact, it is preferable, since it will save this Court, the Court of Appeals, and the parties the time required to address identical objections in two nearly identical PSRs.[1] Nor does it offend due process; Head's

---

[1] The government does agree, however, that the Court should determine on the record the offense

Double Jeopardy argument regarding relevant conduct has been foreclosed.  *See, e.g., Witte v. United States*, 515 U.S. 389 (1995) (finding Double Jeopardy does not apply to sentencing based on relevant conduct).

**B.     Loss**

The PSR correctly calculates loss.  First, as explained above, the loss related to the two superseding indictments must be aggregated under the guidelines.

Second, in proving the total loss, "all that is required is that the government prove the loss by a preponderance of the evidence."  *United States v. Torlai*, 728 F.3d 932, 946 n. 13 (9th Cir. 2013).  To determine the loss, the Court "need only make a reasonable estimate of the loss" and "the court's loss determination is entitled to appropriate deference."  U.S.S.G. § 2B1.1 n.3(C); *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information.").   Here, the PSR's aggregated loss figures result in a very conservative loss amount of $22,658,446.42.  The full extent of the true loss is much greater.

The PSR's loss figures understate the actual loss because the loss was calculated based on the loss to homeowners and lenders from those transactions in which sufficient supporting information existed to determine both (1) the extent of the losses; and (2) which of Head's two related conspiracies they had been victim.  This leaves the losses of hundreds of people unaccounted for.  Their losses were clearly part of one of the conspiracies and they suffered a pecuniary loss, but the government cannot tell with certainty which conspiracy or how much.

A summary of the information that can be determined from public records, bank records, and search warrant evidence is contained in three charts attached and incorporated into the PSR.  Each of the first two charts shows the losses that can be attributed to a particular conspiracy—these are the charts from which the $22,658,446.42 loss figure is derived and are based on the losses of only 123 of the over 300 victims.[2]  The first two charts, however, fail to capture even the complete loss for those 123

---

level, criminal history category, and impose a sentence as to each case.

[2] Head has not objected to the basis or the validity of these calculations, instead focusing his arguments on their grouping.

GOVT. SENT. MEMO. -- CHARLES HEAD         3

transactions because lender loss is incomplete in some cases due to limited available information and because these charts do not capture "rent" payments made by the homeowner-victims to the conspirators.

The third chart is a list of 330 people who were Head's victims in one of the conspiracies based on Head's own business records. Despite the losses to the additional 207 victims, this chart and these victims were not used to increase the loss amount because the exact timing or amounts were unavailable. This means that $22 million likely understates the loss by tens of millions of dollars and the actual loss is probably over $50 million. In fact, the guidelines permit the Court to make an estimate of loss by taking "the approximate number of victims multiplied by the average loss to each victim." U.S.S.G. § 2B1.1 n.3(C)(iv); *See United States v. Scrivener*, 189 F.3d 944, 950 (9th Cir. 1999) (finding district court did not clearly error in determining loss based on a 13% sample). If the first two charts are used as a guide, those 123 transactions resulted in an average (i.e.: mean) loss of $184,215.01 per transaction ($22,658,466.42/123). If this average loss is multiplied by 207, the estimated loss from the additional transactions is $38,132,507.39 ($184,215.01x207). Once added together, the total estimated loss for all victims is $60,790,953.81. The government is not asking the Court to find the loss is over $50 million, but these calculations demonstrate that the loss is unquestionably over $20 million.

To the extent that Head argues that he should get credit for payments made to victims, these payments, as shown by the trial testimony, were small and often undelivered. Most commonly, these payments were $5,000 or less. Even in the counterfactual event that the conspirators had paid an average of $5,000 to each of the enumerated victims in the first two loss charts, this would still only amount to a credit of $615,000 against loss and would not change the guidelines range. Head presents no evidence to show that even this relatively small amount should be credited against loss.

In any event, where, as here, the government has come forward with a method to arrive at a reasonable estimate of the loss, the Court need not consider the defendant's alternate loss calculation unless the defendant can show that it is more reliable than the government's. *See* U.S.S.G. § 2B1.1 cmt. n. 3(C) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence."); *United States v. Johnson,* 540 Fed. Appx. 573 (9th Cir. 2013) (no error to adopt the government's loss calculations where the defendant had not demonstrated why her calculations were

a better estimate of the loss) (unpublished).

### C. A Six-Level Enhancement for Number of Victims is Appropriate

More than 250 victims were defrauded in this case because the victim calculation must include the grouped offenses and relevant conduct. As explained above, Head's offense level is determined by aggregating the conduct from his two offenses. U.S.S.G. § 3D1.3(b) and n.3. As the third chart attached to the PSR demonstrates, at least 330 homeowners and a large number of lenders were victims of Head's two overlapping fraud conspiracies and schemes. The government acknowledges that it cannot state with certainty the amount of the loss or in which of the two conspiracies all of the victims were victimized, but, in this case, it does not matter. These individuals suffered a pecuniary loss as a result of at least one of the Head conspiracies and fraud schemes. Under the grouping rules, whichever conspiracy or fraud scheme it was, the Court would still aggregate the victim numbers. U.S.S.G. § 3D1.3(b) and n.3.

Moreover, the principles of relevant conduct dictate this same result. In determining the appropriate offense level, the Court must consider relevant conduct. U.S.S.G. § 1B1.2(b). Relevant conduct is expansive with respect to offenses which would have been grouped under U.S.S.G. § 3D1.2(d), such as fraud. U.S.S.G. § 1B1.3. Where the fraud was "part of the same course of conduct or common scheme or plan as the offense of conviction," a defendant is responsible for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A) and (2). As a result, a defendant's guideline calculation can be affected by conduct for which he was not convicted. U.S.S.G. § 1B1.3 n.3 ("application of this provision does not require the defendant, in fact, to have been convicted of multiple counts"); *United States v. Watts*, 519 U.S. 148, 156-57 (1997) (finding even acquitted conduct may support a sentencing enhancement). Here, even if not convicted of both conspiracies, Head would still be liable under this principle for the entire group of 330 homeowner-victims defrauded as part of his course of conduct or the common scheme or plan.

Therefore, the PSR correctly aggregates the number of victims and finds that over 250 individuals and lenders were victims.

### D. Head's Offenses Substantially Endangered the Solvency or Financial Security of 100 or More Victims

Head argues that there were only 48 homeowner-victims in Case No. 2:08-cr-093 KJM and 75 homeowner-victims in Case No. 2:08-cr-116 KJM and that therefore an enhancement under U.S.S.G. 2B1.1(b)(16)(iii) and (C) does not apply. As discussed above, Head's conduct is aggregated under both the grouping rules and the rules of relevant conduct. U.S.S.G. § 3D1.3(b) and n.3; U.S.S.G. § 1B1.3(a)(1)(A) and (2). Therefore, the PSR is correct when it adds these two sets of victims (not to mention the hundreds of other victims of the schemes) and finds that Head's offenses substantially endangered the solvency or financial security of 100 or more victims.

### E. A Two-Level Enhancement under USSG § 3B1.3 is Appropriate

Head objects to the application of a two-level enhancement under U.S.S.G. § 3B1.3, arguing that it is already contained within the sophisticated means enhancement (U.S.S.G. § 2B1.1(b)(10)(C)) and is not permitted to be applied in conjunction with the leadership enhancement (U.S.S.G. § 3B1.1).

#### 1. The Section 3B1.3 Enhancement Reflects both Abuse of Trust and Special Skills

Head used his skill and trust as a licensed real estate broker to facilitate his crimes. In California, a real estate broker's license, like Head's, permits an individual to be a mortgage broker. Without licensure, an individual is not permitted to originate mortgage loans. Although the government is unaware of any published Ninth Circuit opinion regarding the application of this enhancement to licensed real estate brokers/mortgage brokers, this enhancement has frequently been applied to mortgage brokers in other circuits. *United States v. Septon*, 557 F.3d 934, 938 (8th Cir. 2009) (applying enhancement to mortgage broker who defrauded lender); *United States v. Wright*, 496 F.3d 371, 377 (5th Cir. 2007) (same); *United States v. O'Malley*, 495 F. App'x 239, 245 (3d Cir. 2012) (unpublished); *United States v. Longwell*, 410 F. App'x 684, 692 (4th Cir. 2011) (unpublished); *United States v. Grant*, 479 F. App'x 904, 906 (11th Cir. 2012) (unpublished); but see *United States v. Fuchs*, 635 F.3d 929, 936 (7th Cir. 2011) (declining to apply the enhancement on the specific facts of that case).

As already reflected in the PSR, the defendant was a licensed California real estate broker. PSR ¶ 65. California real estate brokers are licensed by the California Bureau of Real Estate ("CalBRE"). In order to become a licensed California real estate broker, an applicant who is not already a licensed

GOVT. SENT. MEMO. -- CHARLES HEAD                     6

California attorney needs to complete substantial coursework, including eight statutorily required college level courses in the field, and complete a substantial amount of real estate work experience. *See* Ex. A to the Government's Informal Objections, attached to the PSR at attachment 1. Applicants must also pass a licensing exam. *Id*. Once licensed, a broker is permitted to engage in real estate and mortgage industry activities, such as originating loans, in a manner prohibited to the general public. As a result of this training and licensure, real estate brokers possess special skills not possessed by most members of the public and are in a position of trust with respect to lenders.

In this case, Head used those special skills and position of trust to facilitate the commission and concealment of the offense. In order to skim equity from victims' homes, the conspirators needed to submit loan applications to lenders. Head's training and licensure allowed him to understand how the mortgage system worked and as the Court heard at trial, it allowed Head to train his subordinates, such as Kou Yang, in methods of circumventing the checks and balances in the loan process. Further, because Head was a licensed broker, his companies could send loans directly to the lenders without having to use a third-party as a broker. This facilitated the fraud because it allowed the defendant to become directly involved in the loan process, work with title and escrow to make sure money was diverted to shell companies, and to control title to properties more easily. It also reduced the chance that the fraud would be discovered by giving the conspirators control over the loan process and, effective or actual, ownership of the homes. If a third-party broker had been used, he or she would have been in a position to detect the falsified loan applications, which among other things included applications for multiple properties being sent to multiple lenders at once in a single straw-buyer's name.

Moreover, as stated in both *Wright* and *Septon*, mortgage brokers are in a position of trust in a transaction with the lenders because of the "reliance that flows from the structure of the mortgage industry itself." *United States v. Septon*, 557 F.3d 934, 938 (8th Cir. 2009) (quoting *Wright*). Lenders rely on the information that comes from and through a licensed broker when they deal with that broker repeatedly and the broker is responsible for verifying information. When a broker falsifies supporting documents, encourages false statements on loan applications, and even works actively to circumvent a lender's own independent verification of information contained in loan applications (for example, using coconspirators and others to answer phones in shell company names to provide false employment

verifications, or in another example, shotgunning loans from a single straw buyer to multiple lenders at once to avoid detection of multiple purchases by a single buyer) the broker has abused this position of trust.

The guidelines state that when the potential application of U.S.S.G. § 3B1.3 is based "solely on the use of a special skill" it should not applied if the defendant also qualifies for an enhancement under U.S.S.G. § 3B1.1. As set forth above and as acknowledged by the Eighth and Fifth Circuits, in the case of mortgage fraud committed by a mortgage broker, the enhancement applies both as an "abuse of trust" and as the use of a "special skill." Accordingly, the enhancement is not applied here "solely" for a special skill, and there is no prohibition against applying it along with the leadership enhancement.

### 2. The PSR Correctly Applies the Leadership Enhancement, the Abuse of Trust Enhancement, and the Sophisticated Means Enhancement

The defendant objects that the PSR effectively double counts conduct to apply three separate enhancements: four levels for leadership under U.S.S.G. § 3B1.1; two levels for sophisticated means under U.S.S.G. § 2B1.1, and two levels for abuse of a position of trust under U.S.S.G. § 3B1.3. These three enhancements account for three separate aspects of the offense and do not double-count Head's culpability.

As set forth in the PSR, the "sophisticated means" enhancement is applicable based on the way that the scheme – as a whole – operated. PSR ¶ 33. Head and his co-schemers created multiple types of false and fraudulent documents. *Id*. They also created multiple shell companies to filter the proceeds of the crime. As the Court observed at both trials, Head and his co-schemers created and used extensive "Equity Purchase Agreements" with multiple "Addenda" and "Exhibits" to conceal from the victims that they were losing their homes, and they used multiple grant deeds to conceal the true nature of what the defendants were doing. This sophistication of the underlying scheme merits the two-level enhancement under USSG § 2B1.1(b)(10)(C). PSR ¶ 33.

The enhancement for abuse of a position of trust and use of a special skill is applicable to this particular defendant, and captures conduct not already reflected in the sophistication of the scheme as a whole. Head was a licensed broker, entrusted by the California BRE and entrusted by the lenders to whom he submitted loan applications. As set out above, and acknowledged by various Circuit Courts in

*Septon*, *Wright*, *O'Malley*, *Longwell*, and *Grant,* the enhancement is appropriate because of the special position of trust that a mortgage broker maintains in the real estate industry.

Finally, the leadership enhancement under § 3B1.1 is appropriate because it reflects that this defendant was the person who developed the scheme, trained the co-defendants who made the false representations to homeowners, and supervised the co-defendants who ran the office where much of the scheme took place. Numerous witnesses testified that it was Head who taught them the scam and supervised their activities in carrying out the scam. This leadership, exercising authority to direct the actions of the co-schemers, would be present independent of the fact that Head was a licensed broker, and independent of the fact that the scheme itself was sophisticated. Plenty of other co-defendants will have the "sophisticated means" enhancement applied appropriately, but not all defendants had the same leadership role that Head had.

The enhancements therefore account for different aspects of Head and his role in the offense. The "leadership," "sophisticated means," and "abuse of trust" enhancements all apply to this defendant's role in the offense conduct, and all are appropriately added by the PSR.

### F. Criminal History Computation

#### 1. The 2006 Assault Weapon Conviction is Properly Counted

Head objects that he was improperly convicted in 2006 of the possession of an unregistered assault weapon. His basis for that objection is that because California's Automated Firearms System <u>currently</u> reports that the assault weapon has been linked to his name, it must be the case that the weapon was <u>always</u> registered in his name, making the 2006 conviction invalid. As set forth in the PSR, the police reports from the incident make clear that at the time the police found the weapon in his home, the weapon was not registered. The police report also makes clear that Head admitted to the police that he was the owner of the weapon and that he had not registered it. It is logical that the firearms database now reflects that the Tech-9 is linked to the defendant, because he was caught and admitted to that fact back in 2006. The 2006 conviction is sound, and the conviction counts toward his criminal history.

#### 2. The Enhancement under U.S.S.G. § 4A1.1(d) Applies to Both Indictments

Head objects to the application of two additional criminal history points to the earlier conspiracy charged in case 2:08-cr-093-KJM on the basis that the term of probation did not begin until after the

charged period of the conspiracy.  However, the application notes to that section indicate that this objection is not well founded.  Note 4 to U.S.S.G. § 4A1.1 instructs that the additional points are to be added if "any relevant conduct" was committed by the defendant while he was subject to a sentence of probation.  The Ninth Circuit has considered and rejected the defendant's argument.  *United States v. Smith*, 991 F.2d 1468 (9th Cir. 1993).  Reviewing this same provision of the guidelines and the same application note, the Court in *Smith* concluded that "the application notes clearly allow the district court to consider 'relevant conduct' in considering the criminal history score under section 4A1.1(d)-(e)."  *Id*. at 1470.  Although the defendant in *Smith* argued that "relevant conduct" under § 4A1.1 should be "limited to conduct that is part of the offense of conviction," the Ninth Circuit held that "the plain language of the Sentencing Guidelines demonstrates that the term 'relevant conduct' extends to acts that are part of the same general criminal scheme."  *Id*. at 1470-71.

As set forth in more detail above, all of the conduct in both cases is "relevant conduct" for the purposes of arriving at a guidelines recommendation.  This is the case because of the combined operation of Guidelines Sections 3D1.2 and 1B1.3.  Section 3D1.2 requires that offenses governed the fraud guidelines are subject to mandatory grouping.  And Section 1B1.3 instructs that for any course of conduct where such mandatory grouping applies, then the "relevant conduct" for sentencing includes any conduct that would be part of that mandatory grouping regime.

Accordingly, because the application notes (and the Ninth Circuit in *Smith*) instruct the Court to consider "relevant conduct" in determining whether any part of the offense was conducted while on probation, and because Section 1B1.3 requires that any groupable conduct be considered "relevant conduct," then the two-level enhancement applies regardless of whether the defendant was on probation during the first conspiracy, the second conspiracy, or even during any uncharged related conduct that fell outside the timeframe of the charged conspiracy.  The defendant's criminal history category is III.

**G.**     **Miscellaneous Defense Objections**

       1.     Head's Dependents

The government has no independent information regarding Head's number of dependents; however, it agrees with probation's definition and use of the word.  In relevant part, Black's Law Dictionary defines dependent as "one who relies on another for support."  7th Ed. (1999).  To the extent

that Head's children do not rely on him for support, the PSR correctly lists Head as having no dependents. Moreover, the report is complete because the PSR contains information regarding Head's children in the personal data and family section. PSR ¶ 59.

### 2. Head's Arguments Regarding Innocence, the PSR's Sentencing Recommendation and Other Computations

For the reasons stated above, the government believes that the PSR correctly calculates Head's offense level. Furthermore, Head was convicted by two juries and although Head maintains his innocence the Court should credit the jury's verdict.

### III. GOVERNMENT'S SENTENCING RECOMMENDATION

In this case, the financial losses are staggering, but more importantly, each of these fraudulent transactions involved a family in need who was robbed of their last asset and store of financial security. There is little the government can add to the testimony the Court has already heard, the victim impact statements that have been provided to the Court, and the statements that the victims who are able to make the trip to Sacramento make in Court. The government urges the Court to review and consider those statements.

Our system of justice considers as paramount a defendant's rights to a fair trial and due process. And after a defendant is proven guilty beyond a reasonable doubt, the system instructs a sentencing court to impose a sentence that is sufficient to reflect the seriousness of an offense, provide just punishment, and protect the public from the crimes of the defendant. 18 U.S.C. § 3553(a). Charles Head received two fair trials and now he should receive a sentence sufficiently strict to reflect the harm proven in both cases and the danger Head presents. The guidelines in this case account, in the government's view, for the harm and the seriousness of the offense.

In mitigation, Head presents only one argument in his pursuit of a 165 year downward variance: 30 years is a long time. He presents no other argument, because he has none. Head did no charitable works, he took no responsibility for his family, he has taken no responsibility for his crimes, and he has done nothing to demonstrate that he turned his life around. He targeted the vulnerable and took their last and most important asset. Head's suggestion he will earn money to pay restitution for this is illusory and, to the victims, insulting—Head caused losses so great he will not even be able to pay pennies on

the dollar.  The Court should credit this promise no more than his earlier promises to homeowners that they would keep their equity and title—that is to say, not at all.  Even after conviction in his first case, Head lied.  Thirteen days before his arrest on pimping charges, Head had his attorney tell this Court that Head held a job in the medical industry.  In reality, Head ran an escort service that was the target of an FBI human trafficking investigation.  PSR ¶¶ 57, 63.  Regardless of the eventual outcome of that case, Head lied to this Court and pretrial services for a significant period of time about his employment.  Unlike many defendants in this case and others who take notice of pending federal charges and use their time on pretrial supervision to make a better life, Charles Head has not.  Head offers no reason to believe his life after prison will be any different.

      Head cites to a few cases from other districts around the country to argue that he should receive a 165-year downward variance to a fifteen-year sentence.  This type of anecdotal analysis relies on a faulty assumption that the cases and defendants are equivalent.  As a preliminary matter, the Court lacks the information required to make that determination since it and the parties know very little about the cases Head cites.  Fortunately, a primary goal of the guidelines was individualized sentencing, the recognition that not all cases that appear to be similar are, in fact, similar.  U.S.S.G. Ch.I Pt.A.3.  It strives to do that by examining all details and aspects of the offense (amount of loss, number of victims, sophisticated means, abuse of trust, etc.), and specific characteristics of the individual defendant (criminal history, acceptance of responsibility, likelihood of recidivism, etc.).  As a consequence, "in the ordinary case, the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *United States v. Carty*, 520 F.3d 984, 996 (9th Cir. 2008), quoting *Kimbrough v. United States*, 552 U.S. 85 (2007).   It is, thus, too simplistic to take one or two easily identifiable numbers such as amount of loss and number of victims, and declare that two cases are similar as the defendant now seeks to do.  Comparisons with other cases are also problematic because the ultimate sentence may be lower than the guidelines might otherwise dictate for reasons not apparent on the record such as perceived weakness in the case (e.g., unavailable or unappealing witness) or a cooperation agreement with the defendant.

      The Ninth Circuit has considered and rejected just this type of argument in the past.  *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010).  The mere fact that a defendant "can point to a

defendant convicted at a different time of a different fraud" who received a shorter sentence "does not create an 'unwarranted' sentencing disparity." *Id*. at 1012.  This is because the Court is "[not] presented with the records in the cases on which [the defendant] relies when he argues that other fraud defendants got off better than him." *Id*.  "A district court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before.  Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry … helpful or even feasible." *Id*.  In fact, "[a]voiding sentencing disparity on the basis of easily quantifiable values like amount of loss is a factor that the Guidelines are uniquely well-suited to accomplish." *Id*. at 1011, citing *Rita v. United States*, 551 U.S. 338 at 349 (2007).

Moreover, a few quick examples from closer to home show that sentences often exceed that sought by Head in cases less serious in many respects than his.  For example, in *United States v. Stefan Wilson*, 2:08-cr-114 LKK, Judge Karlton sentenced a Ponzi scheme defendant to 236 months after a plea and admission of guilt.  In *United States v. William Murray*, 2:10-cr-054 EJG, Judge Garcia sentenced a defendant to 235 months for embezzlement after a plea.  Post-trial in a five million dollar Ponzi scheme, this Court sentenced Donald Mann to 210 months in prison and his co-defendant to what was essentially a 120-month life sentence.  *United States v. Mann*, 2:07-cr-229-KJM.  These types of sentences happen in other districts too.  *See, e.g., United States v. Nathanson*, C.D. Cal. No. 8:05-cr-00301–CJC; affirmed 406 Fed. Appx. 162 (9th Cir. 2010) ("Nathanson's [27 year] sentence was substantively reasonable."); *United States v. Jones*, C.D. Cal. No. 2:07-cr-01076-PA; affirmed sub nom *United States v. Jennings*, 434 Fed. Appx. 670 (9th Cir. 2011); *United States v. Lewis*, C.D. Cal. No. 8:04-cr-00016-CJC; affirmed 303 Fed. Appx. 474 (9th Cir. 2008) ("[T]he thirty year sentence imposed by the district court was not unreasonable").

This Court, however, should not sentence Charles Head to a 40-year sentence because of some other case or cases; the Court should sentence Head to a 40-year sentence because of what Charles Head did in this case.  Head is intelligent, not remorseful and not to be trusted.  Forty years is a long time, but it is no greater than necessary to account Head's destruction of hundreds of lives in the wanton pursuit of money and his complete lack of mitigating conduct.  If any fraud case merits a 40-year sentence, it is this case and this defendant.

### IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court find that Head's Offense Level is 47 (reduced to 43 by operation of the guidelines), find that his criminal history category is III, and impose a 40-year sentence of imprisonment.

Dated:  August 27, 2014                           BENJAMIN B. WAGNER
                                                  United States Attorney


                                          By:    /s/ MICHAEL D. ANDERSON
                                                  MICHAEL D. ANDERSON
                                                  MATTHEW G. MORRIS
                                                  Assistant United States Attorney