IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

---oOo---

UNITED STATES OF AMERICA,

             Plaintiff,

vs.                              No.  2:08-cr-00093
                                      2:08-cr-00116

CHARLES HEAD,

             Defendant.

_____/


---oOo---

REPORTER'S TRANSCRIPT

JUDGMENT AND SENTENCE

WEDNESDAY, SEPTEMBER 3, 2014

---oOo---


Reported by:      DIANE J. SHEPARD, CSR #6331, RPR

1                              APPEARANCES

2

3              For the Government:

4
                       BENJAMIN B. WAGNER
5                      UNITED STATES ATTORNEY
                       501 I Street, Suite 10-100
6                      Sacramento, California 95814
                       BY:  MICHAEL D. ANDERSON
7                           Assistant U.S. Attorney

8

              For the Defendant:
9
                       SCOTT L. TEDMON
10                     LAW OFFICES OF SCOTT L. TEDMON
                       980 Ninth Street, 16th Floor
11                     Sacramento, California 95814

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2                WEDNESDAY, SEPTEMBER 3, 2014

3                        ---oOo---

4          (Victim witness statements were read into the record.

5    Victim witnesses made statements to the Court.  Reported but

6    not transcribed.)

7          THE COURT:  Before we move to the Court's process of

8    determining the appropriate sentence -- and that is a

9    deliberative process -- there are a number of steps I need to

10   go through.

11         Let me just ask the Government if it can respond to a

12   few of the questions we've just heard, and one that we didn't

13   hear but the Court did read in one of the letters.

14         The Court is going to, if not today, sometime soon,

15   order restitution.  The recommended total amount of restitution

16   in the report I have before me is in excess of $13 million.  I

17   do see some names of the persons who just spoke on the lists,

18   but I don't see other names.

19         Can you help me understand?  Is it your position that

20   everyone who just spoke in person in court will receive

21   restitution if I use the addendum attached to the presentence

22   report?

23         MR. ANDERSON:  Your Honor, we believe that they

24   should be ordered restitution, and clearly they are victims.

25         There are, as the Court knows, certain victims who

1    it's difficult to assign to one or the other conspiracy that

2    was charged.  So we don't know which case to ask the Court to

3    order restitution in.  It's a legal technicality that is,

4    essentially, depriving these people of restitution that they

5    would be owed.

6              THE COURT:  One question the Court has to decide

7    today is, can I make a final decision on restitution?  I do

8    believe there's information before me that would allow me to

9    make an order of restitution, again, combined total in excess

10   of $13 million.

11             But to the extent it doesn't include some of the

12   people I just heard from, I may wish to continue to get to the

13   bottom of that.

14             MR. ANDERSON:  That may not be a bad idea, Your

15   Honor.  The victims have submitted claims for restitution.

16   Many of those claims have been included in that $13 million

17   number, but it seems that some of the claims, based on the

18   timing of when they were submitted or this other issue that

19   I've raised about which case to assign them to, are not on that

20   restitution list.

21             THE COURT:  All right.  Even if I order

22   restitution -- and I'm speaking to the people I've just heard

23   from.  That's an order.  It would stay with Mr. Head until the

24   amount is paid off.

25             The Government in its briefing actually suggests that

1        it may be that victims receive pennies on the dollar, if they

2        receive anything.  If Mr. Head goes away, as Probation is

3        recommending, for 30 years, there's payment in a very small

4        amount on a monthly basis towards the restitution.

5                So I think we just need to be clear about that.  That

6        there may be some sense of closure to the victims if I order

7        restitution.  Whether or not they see anything in their pockets

8        anytime soon, or ever, is very much in doubt.

9                Any disagreement with that, Mr. Anderson?

10               MR. ANDERSON:  No, Your Honor.  Regardless of the

11       sentence the Court imposes, the restitution amount is so great

12       and the willingness of the defendant or ability is so low to

13       pay the restitution that even to get one or two pennies on the

14       dollar is unlikely.

15               THE COURT:  Is there any forfeiture here?  At one

16       point there were assets.

17               MR. ANDERSON:  There is forfeiture that will be

18       ordered in the 093 case based on a judgment that had happened

19       following the trial.  But, again, that's a forfeiture for a

20       money judgment.  It's not actual money.

21               And then there were some assets that were forfeited

22       early in the case, but those assets in comparison to the

23       restitution owed -- it was such a small amount.  That money was

24       distributed, but it was, again, pennies on the dollar.

25               THE COURT:  And just two more questions related to

1    this general theme.

2              At least two victims, I believe, did ask in their

3    letters -- and to the extent that's a question in anyone's mind

4    here, I wanted to have the Government respond to it -- and that

5    is, why, once the FBI was investigating, didn't that have the

6    effect of essentially staying foreclosure proceedings, or why

7    did that not prevent the loss of the homes?

8              Do you have anything to say about that?  I realize

9    the investigation process was lengthy.  There were two complex

10   cases here.  The Government did obtain convictions.  But,

11   again, to the extent that's a question any victims have, did

12   you have a response to that?

13             MR. ANDERSON:  Your Honor, that's a question that's

14   so complicated that I can't give a short answer to.  Some of

15   the answer is that it took a long time to investigate this

16   case.  It took a long time to understand the full scope of

17   everybody involved.

18             And then on top of it, it's taken a long time to get

19   the convictions and the trial in this case, which can serve as

20   the proof that these people were actually defrauded.

21             One of the problems in this scheme -- problems from

22   the perspective of the victims and law enforcement -- is that

23   it was so spread out among all these different jurisdictions,

24   and they had papered it over with so many fraudulent documents,

25   that any individual victim going into court started out in a

1    very bad position because they are alone, and it's just their

2    word versus these documents that the conspirators have created,

3    and title that's often been shifted to a party who is, at least

4    arguably if not actually, an innocent third party, and lenders

5    who, at least arguably if not actually, are innocent

6    third-party lenders.  There is no way to unwind this without

7    creating further victims.  So that's another part of the

8    problem.  But it's a very complicated answer.

9            THE COURT:  So then my final question, again on this

10   theme, given there are now convictions and there are identified

11   victims, is there anything else the Court can order?

12           Ms. Merchant was just pointing out the collateral

13   consequences.  Is there a document that the Court can order the

14   victims be provided that might provide an explanation to

15   employers, to future renters, to future lenders to mitigate the

16   effects they claim result.

17           MR. ANDERSON:  I think the main document that we're

18   looking for, Your Honor, is the judgment of conviction.  But a

19   statement either from the Court on the record at sentencing, or

20   a statement written by the Court and filed soon thereafter

21   sentencing regarding the status of these people and how this

22   fraud worked would be, I think, very helpful to the victims to

23   the extent that they are litigating.  Some people still are

24   litigating this issue.  Many people over the last few years

25   have lost the opportunity to get their homes back.

1              But to the extent that some people still are, I think

2      there is an opportunity, at least for this Court, to clarify

3      what has happened here, and, finally, to have something from a

4      court that says this was part of a large-scale fraud, these

5      organizations were fraudulent.

6              THE COURT:  Is there precedent for that kind of

7      statement or order?

8              MR. ANDERSON:  No, Your Honor.  I'm not aware of one,

9      but it seems to me that in the course of conducting this

10     sentencing hearing, that the Court will inevitably have to make

11     comments along those lines anyway.  And to the extent the Court

12     creates its record here today, and, if it wishes, on paper, it

13     would be doing a service for the sentencing here, but it would

14     also serve that collateral purpose for these victims.

15             THE COURT:  All right.  That may be the only

16     meaningful thing the Court could do.

17             Mr. Tedmon, anything to say on that last point?  It

18     might be bundled with a continued restitution hearing just to

19     compare the names on the list in the addendum with the names of

20     people who have appeared.

21             MR. TEDMON:  Your Honor, I think the suggested

22     approach makes sense.  The only other suggestion I could make

23     on the victims' side of this is -- I don't know if the U.S.

24     Attorney has the ability to do this, but certainly they are

25     representing the people of the United States -- if something

1    from the U.S. Attorney's Office can be written to assist the

2    victims in terms of their own personal circumstances relative

3    to an explanation regarding credit damage and the other

4    collateral consequences.  That might be another assist to the

5    victims.

6              THE COURT:  All right.  Well, I'm prepared to

7    consider what the Court can do or order.  I hadn't anticipated

8    this, but just comparing names with names on the addendum I

9    think I'm going to continue a final decision about restitution.

10   There will be a restitution order.  I think it will be at least

11   the $13-million-plus figure in the report.

12             I do want to acknowledge Officer Storey from

13   Probation, who did prepare the presentence report.  He's

14   available to answer questions and make comments as we go

15   forward.

16             Here is the process the Court goes through.  I have

17   received a detailed presentence report.  It provides

18   information on the sentencing guidelines, on the sentencing

19   factors that Congress has adopted.  It provides background

20   information on Mr. Head.  There are several letters attached,

21   character reference letters provided by, primarily, family

22   members of Mr. Head.  The Court does review those.

23             The statutory maximum per count -- there are nine

24   counts here, correct, Mr. Anderson?

25             MR. ANDERSON:  Yes, Your Honor.  Total.

1            THE COURT:  Between the two cases together.  I

2    understand the grouping objection.

3            There are total of nine counts, conspiracy and

4    conspiracy to commit mail fraud.  The statutory maximum

5    determined by Congress is 20 years per count.

6            The Government calculates, therefore, the maximum

7    total is 180 years.  The guideline range is up to life, but

8    because there is a statutory maximum, the statutory maximum

9    becomes the cap.

10            The recommended sentence from Probation is 180 months

11    per case, consecutive, so a total of 360 months.  The

12    Government is requesting a total of 40 years.  So what are the

13    months there?

14            MR. ANDERSON:  480 months, Your Honor.  And we're

15    asking that it be imposed on each case, and it then be imposed

16    to run concurrently with each other.

17            THE COURT:  That's a range of the options before the

18    Court.  I need to make a guideline's calculation.  The

19    guidelines are advisory at this point, but I need to make a

20    calculation.  Mr. Head has lodged objections I need to consider

21    and rule on in running that calculation, and then I'm required

22    to consider the sentencing factors adopted by Congress.

23            So, first, to address the objections from Mr. Head.

24    And as a threshold matter, there is no objection to use of the

25    2013 manual here, no ex post facto issues, Mr. Tedmon?

```
 1                    MR. TEDMON:  Correct.

 2                    THE COURT:  Agreed, Mr. Anderson?

 3                    MR. ANDERSON:  Yes, Your Honor.

 4                    THE COURT:  And in terms of the standard, in terms of

 5        finding whether or not an enhancement applies, the standard

 6        generally is preponderance of the evidence.  But if something

 7        is a significant enhancement, then I need to consider whether

 8        or not clear and convincing evidence is the standard.

 9                    Does the Government have a position as to whether or

10        not I need to apply a clear and convincing evidence standard to

11        any enhancements?

12                    MR. ANDERSON:  No, Your Honor.  The only enhancement

13        that would be large enough to require that would be loss, but

14        loss is excluded from the clear and convincing requirement, and

15        I believe it's Treadwell that establishes that preponderance is

16        sufficient.

17                    THE COURT:  Anything to say on that point,

18        Mr. Tedmon?

19                    MR. TEDMON:  No, Your Honor.

20                    THE COURT:  All right.  I believe the Government is

21        correct.  That's the approach I am going to follow.

22                    Just a few background questions so I have some of the

23        facts straight.  Mr. Head did obtain 60 hours of credit from a

24        community college.  What was the course of study, Mr. Tedmon?

25                    MR. TEDMON:  It had to do with real estate.
```

1          THE COURT:  All right.  And the report indicates

2     Mr. Head was a licensed mortgage broker.  Was he also a

3     licensed real estate broker?

4          MR. TEDMON:  Yes, he was, Your Honor.  And also as

5     far as the college credits go, it was real estate and then

6     business as well, or some business courses related thereto.

7          THE COURT:  On the grouping, Mr. Tedmon, just so I

8     understand, the Government points to guideline 3D1.1 n.1(B),

9     which does address the issue of separate cases.

10          Is it your position that that application note

11     doesn't apply here?  It appears to the Court that it does.

12          MR. TEDMON:  Your Honor, in looking at the

13     Government's response, it appears that it does.  My concern,

14     though, is two-fold.  One, I think that given the fact that in

15     this case the Government chose to indict in two Indictments and

16     separate conduct essentially bifurcates the cases.  And I think

17     because of that, the second point we get into is this whole

18     issue of double jeopardy at sentencing.

19          So as the Court has read in my brief -- and I have

20     much else to add to that -- I think they should be dealt with

21     separately.  They should not be combined, irrespective of what

22     the Government has cited, because of the nature and form in

23     which the Government has decided to prosecute the two cases.

24          THE COURT:  Have you said everything in the briefs

25     that you would say on that point with respect to the

1        Government's decision to charge separately, Mr. Anderson?

2                MR. ANDERSON:  I don't think the Government's

3        decision to charge separately has anything to do with the

4        decision that's before the Court.  It's just the guideline's

5        application just like the Government has laid out, so I'm not

6        going to add anything beyond that.

7                THE COURT:  Having thought carefully about the

8        defense position, read the guideline's note, reviewed the

9        Government's briefing, I do think there is substantially the

10       same harm here, and, therefore, grouping is appropriate under

11       the guidelines, which are advisory.  So that objection is

12       overruled.  I understand it does apply to several of the

13       specific paragraphs in the report.

14               MR. TEDMON:  It does.

15               THE COURT:  Just thinking about that, even if I

16       adopted the defense position on all of the enhancements,

17       doesn't that still render an offense level of 43?

18               MR. TEDMON:  No.

19               THE COURT:  You say it's 39?

20               MR. TEDMON:  Yes.

21               THE COURT:  If I adopt all the grouping, which would

22       be paragraphs 31, 32, 34, 39 and 42, aren't those the

23       paragraphs implicated by the grouping objection?

24               MR. TEDMON:  Yes, it would be, Your Honor.  And I

25       think, given the Court's decision as relates to grouping for

1    loss, which would be $22,658,446.42, that's the aggregate loss

2    figure, that would add two points to my calculation of the

3    offense level in case 093.  So that would be an offense level

4    of 39 in 093.  In case 116, taking the same analysis, and

5    keeping that in mind, the offense level would be 41, if the

6    Court would accept my objections on the other issues.

7             THE COURT:  All right.  Still pretty high on the

8    table.

9             MR. TEDMON:  It is.  We also have the

10   criminal-history issue in terms of the downward departure for

11   overstating his criminal history.

12            THE COURT:  I'm getting to that.

13            MR. TEDMON:  That would have some impact,

14   potentially.

15            THE COURT:  Anything else to say on the paragraphs

16   affected by the grouping objection?  I'm going to get to some

17   of those paragraphs individually.

18            MR. ANDERSON:  No, Your Honor.  I understand that you

19   are overruling the defendant's objection to that.

20            THE COURT:  I am.

21            With respect to dependents, Mr. Tedmon, response to

22   the Government's using a plain dictionary definition to define

23   dependents?  Are the three otherwise identified in the report,

24   do they qualify as dependents legally?

25            MR. TEDMON:  I think they do.  My understanding is

 1    that Mr. Head, as to at least two of the children, is under a

 2    court order to make support payments.  So whether the Black's

 3    Law Dictionary is accurate or not in terms of a base

 4    definition, I believe there's been a court order as to his

 5    ongoing responsibility to make child support payments.

 6            Now whether he can do that or not, ever, is a

 7    different question, but I don't think that takes away from the

 8    fact that those are two dependents.

 9            And then as to the other child, who is younger, he is

10    still -- his family is still trying to care for that child, and

11    he certainly has an obligation to that child as well.  So I

12    think the three dependents is accurate.

13            THE COURT:  All right.  I don't think it necessarily

14    changes anything, but I will make that correction as requested

15    on page 4.  It is consistent with other information in the

16    report.

17            In terms of the summary recommendation on page 5, I

18    understand the objection.  The objection is recorded and

19    preserved.  Ultimately, the Court will articulate its reasons

20    for the sentence.  It will not be reading verbatim from this

21    summary.  So the objection is overruled.  This is the probation

22    office's recommendation.  Not the Court's ultimate decision.

23            With regard to the objections, pages 7 to 9,

24    paragraphs 11 through 22, Mr. Head's position is noted.

25            With respect to page 8, paragraph 13, the

1          Government's position on the second part of the first sentence,

2          "and straw buyers from online referrals"?  Mr. Head's position

3          is that's factually incorrect.

4                    MR. ANDERSON:  No, Your Honor.  I believe there was

5          testimony at trial that straw buyers -- and some of them

6          testified themselves -- found Funding Foreclosures or the Head

7          Financial Enterprises group of companies through websites

8          online, including 50Kperyear.com and 30Kperyear.com, and that

9          those websites were used to solicit straw buyers.

10                   THE COURT:  Mr. Tedmon, do you construe the trial

11         testimony differently than the Government?  Does Mr. Head?

12                   MR. TEDMON:  Well, Your Honor, on that point, I don't

13         think that the way that it's stated is accurate.  And the

14         reason I say that is that the specific sentence of:

15         Conspirators solicited homeowners who were in financial

16         distress primarily through referrals from loan brokers

17         throughout the United States and straw buyers from online

18         referrals, Funding Foreclosures, 50Kperyear and

19         30Kperyear.com -- my recollection of the testimony is that

20         those companies were not the origin of the solicitation or the

21         referral.  And so, in that sense, I don't think that's

22         accurate.

23                   THE COURT:  Does it make a difference in the Court's

24         ultimate analysis?

25                   MR. TEDMON:  Well --

1          THE COURT:  Without going back and checking the

2     actual trial testimony.  There was testimony about the

3     50kperyear, the 30Kperyear.  I think it's the characterization

4     of whether or not solicitations came through referrals.  Is it

5     "solicited straw buyers from online referrals"?  How is that

6     sentence to be read?

7          MR. ANDERSON:  It could be changed to:  And straw

8     buyers solicited at least in part from online referrals

9     including from FundingForeclosure.com, 50kperyear.com and

10    30Kperyear.com.  It changes it a little bit.

11         MR. TEDMON:  Your Honor, I think that language would

12    be more reflective of the facts.

13         THE COURT:  Straw buyers solicited from online

14    referrals?

15         MR. TEDMON:  Yes.

16         THE COURT:  So that modification is made.  To

17    clarify, the objection is sustained in that respect.

18         Page 8, paragraph 14, second to last sentence.

19    Mr. Anderson, any reason to keep that sentence in?

20         MR. ANDERSON:  I don't know that it matters much one

21    way or another.  I think it's factually accurate and supported

22    by the testimony we heard at trial, but it doesn't change much.

23    The equity was placed on the seller's side of the statement.

24    Maybe it's the "hidden" part that's objectionable to

25    Mr. Tedmon, if he wants the word "hidden" stricken.

1              THE COURT:  I'm going to sustain that objection and

2       have that sentence deleted.

3              And then looking specifically at paragraph 31.

4       First, let me ask Mr. Tedmon.  Paragraph 17, you have not

5       objected to those numbers?

6              MR. TEDMON:  Correct.

7              THE COURT:  In terms of the objection to

8       paragraph 31, on the issue of credits, the Government addresses

9       the credit question in part in its briefing.

10             But, Mr. Anderson, can you clarify for the Court the

11      Government's position with respect to the monthly mortgage

12      payments, payments made between initial purchase and

13      foreclosure.

14             MR. ANDERSON:  The Government's position is to the

15      extent that there might be credits for those payments, they are

16      offset by the rental payments that victims were making to the

17      conspirators.  They are also much smaller than would have any

18      impact on the loss calculation, so they would not affect the

19      loss calculation.

20             And in any event, as the Government goes through and

21      establishes, there are numerous victims for whom the loss has

22      not been added into this loss calculation.  Therefore, whatever

23      credits might be applied would be miniscule in comparison to

24      those losses.  So it's a wash, at best, for the defense, and

25      that the 22-million-and-change that's cited by the Government

1    is a reasonable estimate of the loss figure on that basis.

2              THE COURT:  And Mr. Tedmon, anything to say about the

3    Government's calculation?  If there is credit for the lump

4    sums -- the $3,000, the $5,000 -- that would aggregate to

5    615,000 and not change the guidelines.  Assuming that the Court

6    groups.  I understand your grouping objection.  I continue to

7    overrule that.

8              MR. TEDMON:  I understand.  Can I have a moment, Your

9    Honor?

10             THE COURT:  Yes.

11             (Discussion between defendant and counsel.)

12             MR. TEDMON:  Your Honor, I think it's maybe a

13   distinction without a difference.  The Government has at least

14   endeavored to come up with an amount of credit against loss.

15   They come up with $615,000.  It may be more than that.  There

16   is this counterbalancing argument that there is additional

17   losses that have not been included.

18             But I think on behalf of Mr. Head, we've stated our

19   position as to why each of the cases in 093 and 116 should be a

20   20-level increase of more than 7 million but not more than 20

21   million rather than the 22-level increase for being over 20

22   million.

23             I think, in any event, given the loss amounts that

24   we're agreeable to, the credits would not reduce the level down

25   to a Level 18.  The Court's already spoken on the grouping

1    issue.  So we would just submit it on the briefs at this point

2    as far as credits go.

3          THE COURT:  All right.  The report notes that most,

4    if not all, of the lenders have failed.  There are no offsets

5    from separate recovery from any lenders here that the Court

6    should take account of.

7          MR. ANDERSON:  Recovery to the victims or -- recovery

8    to the homeowner victims or recovery to the lender victims?

9          THE COURT:  The homeowner victims.

10         MR. ANDERSON:  Right.  We're not aware of any

11   recovery that the homeowner victims were able to obtain from

12   the lenders.

13         To the extent that the homeowner victims got the home

14   back, it was with the equity already stripped out, so it wasn't

15   a credit to them.  They still sustained a loss.

16         THE COURT:  Anything on that point, Mr. Tedmon?

17         MR. TEDMON:  I think that's an accurate summation.

18         THE COURT:  All right.  Then looking at the objection

19   to paragraph 32, the number of victims, which is calculated in

20   the report as homeowners and lenders, are you arguing,

21   Mr. Tedmon, that the Court can't take account of relevant

22   conduct?

23         MR. TEDMON:  Well, again, it's really the same

24   argument I've made before, Your Honor, on loss.

25         The Court can take into account relevant conduct.

1    However, the Government decided to indict two separate schemes,

2    and I think they should be handled that way.  And then

3    Probation very diligently went through and identified, with the

4    Government's input, the number of homeowners as to each case.

5    And there are 48 identified homeowners in 093, according to the

6    probation report, and there are 75 homeowners in case 116.

7          And I think to start borrowing one case against the

8    other, given the way the Government laid the case out from the

9    date of the Indictment forward, is inappropriate.  And I think

10   it's a way of grabbing an additional couple levels by simply

11   merging the two cases together.

12         I understand the concept of relevant conduct, but I

13   think the Court should also be mindful of the fact the

14   Government can choose to do what it wants in terms of charging

15   individuals, and, in this case, they decided to charge Charles

16   Head with one scheme in 093 with a defined timeframe, and a

17   separate scheme in 116.

18         I think to now put them together creates a real issue

19   here in terms of abusing the rules of relevant conduct beyond

20   what is intended.  They should be dealt with separately.

21         And on these specific enhancements that we're

22   following -- this one and others the Court will get to -- I

23   think the cases have to stand on their own as it relates to the

24   relevant conduct as to that Indictment and not borrow one to

25   the other.

1              THE COURT:  Help me understand your position on what

2      I think is being referred to as the third chart --

3              MR. ANDERSON:  Yes, Your Honor.

4              THE COURT:  -- which has the 330.  You haven't

5      objected or disputed the information on that chart.  Do I have

6      that right, Mr. Tedmon?

7              MR. TEDMON:  Yes, the third chart.  I want to make

8      sure.

9              THE COURT:  Based on the search warrant.  Records

10     obtained through those search warrants.

11             MR. TEDMON:  Yes.  I've reviewed that, and I don't

12     think there's anything in error there.  I don't think that the

13     information that's been relayed in that chart is inaccurate.

14             What I'm challenging and objecting to is taking the

15     information from one case and overlaying it onto the other for

16     purposes of enhancing -- in terms of increasing the

17     enhancements.

18             THE COURT:  All right.  Again, I understand that

19     argument.  Anything else to say on the objection to

20     paragraph 32, Mr. Anderson?

21             MR. ANDERSON:  Submitted on what we filed, Your

22     Honor.

23             THE COURT:  All right.  I'm overruling that

24     objection.

25             Paragraph 34.  The objection also relies here on the

1    grouping objection, correct, Mr. Tedmon?

2            MR. TEDMON:  That's correct.

3            THE COURT:  Again, finding the grouping is

4    appropriate, I'm overruling that objection.

5            Paragraph 37 is not related to the grouping

6    objection.  It's whether or not the Court should enhance for

7    abuse of a position of trust, assuming that the sophisticated

8    means enhancement is applied.  Sophisticated means is applied

9    at paragraph 33.  That's a two-level enhancement.

10           Here, we've clarified that Mr. Head was both a real

11   estate broker and a mortgage broker.  The defense argues that,

12   essentially, both enhancements rely on the use of a special

13   skill, if I have that right, but the Court can also find the

14   enhancement for abuse of trust specifically.

15           I've reviewed all of the cases the parties have

16   provided to the Court.  My tentative conclusion, having

17   reviewed the case law -- and I'll have you respond to this if

18   you think I'm not grasping what the law is saying.

19           Sophisticated means.  I'm prepared to adopt the

20   probation officer's recommendation that sophisticated means

21   were used by Mr. Head as the leader of this effort through the

22   establishment of multiple companies, the attempt to insulate

23   himself by having those who worked with him create their own

24   companies, retaining attorneys to develop the documents he used

25   in the scheme, the use of power of attorney documents,

1    notaries -- valid notaries, but still notaries to formalize

2    matters, and also the targeting of the postcards to the likely

3    prospects.  I think those all support sophisticated means.

4            I think even if the Court adopts the reasoning of the

5    Fuchs court, the Seventh Circuit -- and I am persuaded by much

6    of what the Court in Fuchs says, but the facts there are

7    distinguishable in looking at abuse of trust.  There, it was

8    someone who was not licensed.  There was a focus on lenders.  I

9    do think that is an important distinction here.

10           While I understand the Government's position that

11   both borrowers and lenders were victims, the Court is most

12   persuaded by the need for the enhancement, in many respects,

13   based on the effect on the homeowners.

14           And I think, given his position, Mr. Head's position

15   as a mortgage broker, the homeowners having looked for the

16   right fit given their distressed situations -- as Ms. Flores'

17   statement said, I'm looking for a professional to assist in a

18   time of need -- I think there are separate reasons apart from

19   simply the use of a special skill to impose the abuse of trust

20   enhancement.

21           Mr. Tedmon, your response to that tentative

22   resolution of the defense argument?

23           MR. TEDMON:  Well, Your Honor, first of all, the

24   defense has not objected to the sophisticated means

25   enhancement.

1              THE COURT:  I understand that.  But your point is

2     that if that is applied, then abuse of trust should not.

3              MR. TEDMON:  I agree.  That's exactly my position.

4              And beyond that, though, we haven't objected to the

5     four-level enhancement for aggravating role.  That adjustment

6     under 3B1.3 limits the application of 2B1.1(b)10(C) if it's on

7     the use of a special skill.  My position is that's exactly what

8     was contemplated by the guidelines.

9              And as far as the Court's tentative position that it

10    was an abuse of a public or private trust, I disagree.  I think

11    the facts that came out in the case at trial was that Mr. Head

12    was a mortgage broker and a real estate broker, which is really

13    one in the same in terms of the way the licensing worked when

14    he was in business, and that was a skill that was utilized

15    within his office.

16             For example, I noted in my brief that the probation

17    reports indicates that Mr. Head trained Kou Yang to promote

18    these documents that were not accurate.  That's using a skill

19    to perpetuate the fraud for which he was convicted, but I don't

20    think it raises itself to the level of abusing a position of

21    private or public trust, whether it's the homeowner or the

22    lender.  I think the objection is appropriate, and the Court

23    should adopt it.

24             THE COURT:  Mr. Anderson?

25             MR. ANDERSON:  Your Honor, I think it's appropriate

1    based on the homeowner victims, as the Court has identified,

2    and also on the lender victims, as the Government has laid out

3    in its filing, and also based on what's in the PSR.

4              He used that special position as a broker, that

5    position of trust, in order to get things done with the lender

6    that he otherwise could not do, and to solicit homeowner

7    victims who otherwise would not have been brought in as

8    victims.  I'll submit on that.

9              THE COURT:  All right.  I am sticking with my

10   tentative.  I'm overruling the objection.

11             Just so it's clear, I do see the sophisticated means

12   as based on a separate set of activities than the abuse of

13   trust enhancement.  Sophisticated means, Mr. Head did not have

14   to rely on that broker status.  I don't think the cases or the

15   guidelines allow for the drawing of bright lines here, so it's

16   not whether or not he was a broker.

17             But in this Court's mind, given the facts of this

18   case, it's the status as a broker, given the way in which

19   Mr. Head held himself and his company out, that justifies the

20   abuse of a position of trust.

21             He did obtain authority over the victims' homes, and

22   they, through the paperwork he had them sign, they vested him

23   with significant discretion.  And so that enhancement will

24   remain as set forth in the PSR.

25             The objections to paragraph 39 and 42 are just

1    objecting to the total numbers derived from the other

2    calculations we've just reviewed, so those objections are

3    overruled.

4              Regarding criminal history, Mr. Head does argue that

5    the criminal history is overstated.  The Government's position

6    is that the criminal history computation -- does that also rely

7    on the rationale for grouping, Mr. Anderson?

8              MR. ANDERSON:  Yes, Your Honor, and relevant conduct.

9    With respect to the probation part.

10             THE COURT:  But with respect to the separate

11   calculation for each case, the defense argues that criminal

12   history should be calculated separately, looking at the point

13   in time of each case having been filed.

14             MR. ANDERSON:  In a way that's right but reaches the

15   wrong destination.  The Court should calculate offense level

16   and criminal-history separately for each case, but you do it

17   based on relevant conduct.  So when you apply the rules of

18   relevant conduct in each case, you pick up the larger

19   timeframe, and then you end up with the criminal-history

20   category of III in both cases.

21             THE COURT:  Mr. Tedmon, anything more to say on that

22   point?

23             MR. TEDMON:  Well, just briefly.  The guidelines

24   state that you have to be on probation while committing the

25   instant offense.  And the instant offense in each of the

1   Indictments is prescribed by the Government in case 093 as

2   starting no later than January 1st, 2004 to at least

3   March 16th, 2006.

4          Mr. Head's probation, misdemeanor probation, in

5   docket number 06-NF-0855, which is reflected on page 13,

6   paragraph 49 of the presentence report, began on April 27,

7   2006.  That is clearly after the timeframe enumerated by the

8   Government as to, in case 093, the, quote, instant offense.

9          And so relevant conduct doesn't come into play, from

10  my perspective, as far as it relates to that two-point

11  increase.  I don't know how the Government can extend it past

12  March 16, 2006 for the instant offense.  The Government itself

13  categorized the timeframe.  And the probation is clearly

14  outside of that prescribed timeframe.  So on that basis, the

15  two points for being on a sentence of probation does not apply

16  in case 093.

17         Now in case 116, that argument is not being made

18  because that calculation is different because the timeframe

19  that the Government alleged in case 116 does incorporate the

20  April 27, 2006 date.

21         That's why the criminal histories are different in

22  each of the cases, from my point of view.

23         THE COURT:  Anything further on that, Mr. Anderson?

24         MR. ANDERSON:  No, Your Honor.  We cover it in our

25  brief where we talk about 4A1.1 n.4, and then United States v.

1    Smith, which is a Ninth Circuit case which addresses this issue

2    very clearly.

3              THE COURT:  All right.  The defense has made its

4    record.  I am persuaded, having consulted the guidelines in the

5    parties' briefing, that the Government is correct.  That

6    objection is overruled.

7              On that point, I've also looked carefully at the

8    arguments the defense makes with respect to the gun and the

9    registration.  And the information in paragraph 60 doesn't mean

10   that the gun was registered.  Even if the name is linked, that

11   doesn't mean registration.  Do you agree, Mr. Tedmon?

12             Are you saying the only way the firearm could have

13   ended up in that Automated Firearms System is if it were

14   registered?

15             MR. TEDMON:  Yes.  That's exactly what I'm saying.

16   And, furthermore, I think that the facts as set forth in the

17   probation report by definition eliminate the Government's

18   argument factually.

19             Because when Mr. Head was arrested on this gun

20   charge, this misdemeanor gun charge, law enforcement seized the

21   weapon.  Now, it was never returned to Mr. Head, but, yet, in

22   the Automated Firearms System that exact weapon was reported to

23   be in his name.

24             Now, the only way you can get it in your name is to

25   register it.  You can't just go to Big5 Sporting Goods and just

1    say, hey, that's mine, let's put it in my name.  You have to

2    register it.

3              So I think the reality is, on this particular issue,

4    the assertion on page 12, paragraph 46, which is the criminal

5    history section of it, runs counter to the information

6    contained on page 15, paragraph 60.  And when you look at the

7    two in context, it was registered in Mr. Head.

8              And that being the case, this conviction is improper

9    factually, clearly.  And, frankly, Mr. Head was given

10   inappropriate legal advice by entering the conviction.  That's

11   nothing I can take care of now, but I think the Court can view

12   it in the context of the facts that have been set forth in the

13   probation report.  And I think it's clear that the only way it

14   can get into that system is if Mr. Head had it registered in

15   his name, particularly given the fact he was never given the

16   weapon back.  There was no other way to do it.

17             THE COURT:  But you haven't challenged his admission

18   that he was the owner and had not registered the gun?  Are you

19   also challenging that narrative?

20             MR. TEDMON:  Yes.

21             THE COURT:  All right.

22             MR. TEDMON:  That's what I'm saying.  I can't go back

23   and change the plea in that case, but it was not factually

24   supported.  And my position is that if Mr. Head's counsel had

25   given him accurate information, then that conviction should not

1    have ever been entered because it doesn't have the factual

2    predicate necessary for the conviction.

3              So while he did plead to that, the Court can look at

4    this now to determine if it overstates his criminal history,

5    which I believe it does.  It's not factually supported.

6              THE COURT:  Officer Storey, help me understand

7    paragraph 60.  What is your position about what shows up in

8    that system?  When was that report run?  And does that mean the

9    firearm was registered in Mr. Head's name?  It's not obvious to

10   the Court looking at the language of paragraph 60.

11             MR. STOREY:  If you'll give me a minute, I'll look

12   for that document.  I'm not an expert on reading these reports.

13   I can't tell you with certainty what exactly it means.

14             But that gun is associated with this defendant.  And

15   I tried to outline in the commentary on paragraph 46 what the

16   police report and the officer handling that case -- a summary

17   of what that incident was.

18             And I would just reflect that according to the

19   officer, the defendant did admit that he was the owner of the

20   assault weapon and did not register the gun.

21             THE COURT:  Mr. Tedmon is challenging the

22   effectiveness of counsel.

23             Isn't this something that would need to be cleared

24   up, at this point, through a habeas petition, Mr. Tedmon, for

25   the Court to ultimately accept the argument?

1          MR. TEDMON:  That's certainly a possible avenue, Your

2     Honor.  Because I think at this point we're a little bit

3     hamstrung by the fact that Mr. Head plead guilty.  There is

4     some dispute as to what he admitted to the police at the police

5     station, that he was the owner of the assault weapon and had

6     not registered the gun.

7          I think the objection that I made is clear in terms

8     of objecting to the factual predicate that he wasn't the

9     registered owner.  He was.  And I think the information on

10    page 15, paragraph 60, relative to the information obtained

11    from the Automated Firearms System supports that position, but

12    that's all the information we have.

13         THE COURT:  All right.  I think the Court can't get

14    to the bottom of this today, regardless of whatever Officer

15    Storey determines.  I think, given the conviction, I'm not

16    prepared to find that the information in paragraph 60

17    essentially nullifies the conviction.

18         I do think it's a matter, if Mr. Head wishes to

19    pursue it, potentially for a habeas petition without commenting

20    on the ultimate merits of such a petition.

21         So to the extent the criminal-history analysis

22    objection is based on that issue, it is also overruled.

23         MR. TEDMON:  Your Honor, could I make one other point

24    on that before the Court moves on?

25         I think there is another aspect to this, and it's as

1   follows, on this particular issue.  I think the record is not

2   clear as it relates to the conflict between the conviction and

3   what may be referenced on paragraph 60 -- page 15,

4   paragraph 60.

5           And I think when the Court is confronted with that

6   sort of thing, that is a fair and reasonable basis to depart

7   downward, even if the Court can't resolve the conflict as it

8   relates to the conviction at the time it was entered and the

9   information we have now.

10          Because the facts are somewhat muddled on that issue,

11  and there is no clarity to it, rather than put it in Mr. Head's

12  lap to file a habeas petition, I think the Court can take that

13  lack of clarity on that issue and find that it's sufficient to

14  allow for the downward departure of one point, which is what

15  I'm asking for, in his criminal-history score.  So that would

16  be the other argument I would ask the Court to consider.

17          THE COURT:  All right.  Anything to say on that,

18  Mr. Anderson?

19          MR. ANDERSON:  Not if the Court's prepared to deny

20  that request.

21          THE COURT:  Well, understood.  I'm not prepared to

22  enter into a departure.  I'll consider the argument in the

23  context of a possible variance argument.

24          MR. ANDERSON:  Your Honor, I would just like to point

25  out on one hand we have a police report, we have a guilty plea,

1    and we have a conviction that, at least as it's before this

2    Court, is a lawful conviction from another court.

3              Against that, there's sort of a strange reading that

4    Mr. Tedmon has given to these paragraphs when there is a

5    perfectly consistent reading that the Government has explained

6    in its briefing.

7              Against that and the fact that there is no evidence

8    introduced by the defense that there is anything wrong with

9    this conviction, other than sort of the suppositions or

10   speculation of defense counsel, I'd ask the Court just not to

11   consider or vary on that basis.

12             THE COURT:  All right.  I'll ultimately make that

13   decision.

14             Just finally, in terms of my ruling on the

15   appropriate sentence, that will make clear my position as to

16   the final objections objecting to the sentencing recommendation

17   of the probation officer.

18             But there is an objection to special conditions 6, 7

19   and 8?

20             MR. TEDMON:  Yes.

21             THE COURT:  Officer Storey, I don't see that there is

22   any indication of any history of substance abuse.  Do I have

23   that wrong?

24             MR. STOREY:  On page 16, paragraph 64, there is a

25   history of marijuana use, and, furthermore, he declined to

1    discuss it, and so it's there as a treatment option should it

2    be an area that needs to be addressed.  But primarily because

3    of the marijuana history.

4              THE COURT:  It does say that he said he had not used

5    medical marijuana in over 20 months, and, of course, the

6    Federal Government doesn't acknowledge medical marijuana

7    exceptions.

8              Mr. Tedmon, on that point, given that information?

9              MR. TEDMON:  I don't know that it's sufficient to

10   impose the conditions -- special conditions 6, 7 and 8.

11   Mr. Storey did not indicate to the Court just now -- I mean, he

12   interviewed the defendant's father.  He wasn't aware of any

13   substance abuse history.

14             And I just think, to me, given the length of time

15   between the charges and now, and the information that

16   Mr. Storey was given from Mr. Head that he hasn't used medical

17   marijuana in over 20 months, pre-dating the date of the report,

18   it's not factually supported to impose those conditions, and I

19   think it's unnecessary.

20             Furthermore, without projecting what the sentence

21   might be, my position is Mr. Head should be given a sentence of

22   15 years.  He's going to be in his 50s even if the Court were

23   to follow my thinking and my proposed sentence.  I think it's

24   overreaching to impose those drug conditions at this point.  I

25   would ask the Court not to impose them.

1          THE COURT:  All right.  We obviously have moved into

2    the noon hour.  The Court is inclined to continue unless the

3    parties have extensive argument.  I think we can finish this up

4    before 1:00.

5          Let me ask the court reporter.  Do you need a break

6    at this point in time?

7          THE REPORTER:  If we are going to finish by 1:00,

8    that's fine.

9          THE COURT:  Can counsel go until 1:00 without a

10   break?

11         MR. ANDERSON:  Yes, Your Honor.

12         MR. TEDMON:  Yes.

13         THE COURT:  My final question -- I think I've dealt

14   with all the objections, Mr. Tedmon, correct?

15         MR. TEDMON:  Correct.

16         THE COURT:  I would like to have the Government

17   discuss briefly the methodology, particularly if I'm going to

18   rely on the information supporting the $22 million-plus figure.

19   If I just add up the numbers linked to the two cases, it's the

20   13-plus, which is the number that would provide the basis for a

21   minimum restitution award.

22         MR. ANDERSON:  Are we talking exclusively restitution

23   or are you talking loss?

24         THE COURT:  I'm talking loss now.  So one remaining

25   question in the Court's mind is about the loss calculation.  I

1     understand the relevant conduct argument.  But if I understand

2     correctly at this stage of the hearing, the information

3     supporting the $22 million figure also draws on that third

4     chart.

5              MR. ANDERSON:  No, Your Honor.

6              So the $22 million figure is the sum of the

7     information, the loss from the first chart and the second

8     chart.  It excludes the third chart.

9              THE COURT:  All right.  That's correct.

10             Is there anything in the record that explains the

11    method?  There are columns here.  Can you just summarize the

12    method?

13             MR. ANDERSON:  I would be happy to, Your Honor.

14             The first column "proceeds to seller" -- I'm looking

15    at the first chart, but both charts are laid out in essentially

16    the same way.

17             The first chart, in the first column of loss,

18    "proceeds to seller" is the amount of equity that was stripped

19    from the homes.  That was determined by looking primarily at

20    HUD-1 documents, which showed the amount of equity diverted to

21    shell companies controlled by Charles Head and his

22    co-conspirators.

23             The second column, second "proceeds to seller," are

24    from transactions that occurred during the course of the

25    conspiracy where the conspirators, including Charles Head,

 1     re-sold or re-mortgaged the property to take out additional

 2     equity.  So that's a second attempt at taking out more equity.

 3     And that, again, is calculated based on the amount of equity

 4     removed from the homes, which generally is found on the HUD-1

 5     forms.  In fact, in almost all cases was from the HUD-1s.

 6              The third column is the foreclosure column.  That's a

 7     loss to the lender.  In cases where the property was foreclosed

 8     on -- and certainly more of these properties were foreclosed

 9     on, but this is where records -- reliable records were

10     available -- what was done was the IRS agent took the amounts

11     of the loan, so the base price of the loan without any addition

12     for accruing interest or penalties or anything of that nature,

13     and then subtracted from that the foreclosure sales price, and

14     the difference was the loss to the lender that we attributed

15     and placed on this chart.  The same thing holds true for the

16     second chart, the loss amount in Head II.

17              And then, as we explained in our filings, these loss

18     amounts are only for the victims that we could readily identify

19     as belonging to one or the other of these conspiracies and also

20     had reliable documentation regarding the exact amount of the

21     loss so that we could calculate it.

22              There are victims that are contained on the third

23     chart for whom, because of either missing records or ambiguity

24     in the records, we can't determine the exact amount of their

25     loss or exactly which conspiracy they were a victim of.  We

1    know they were a victim of one of the conspiracies.  We know

2    they suffered a pecuniary loss, but we don't know exactly how

3    much or when.

4              THE COURT:  All right.  At least some of those

5    persons are the persons that I want to address in a follow-on

6    restitution hearing.

7              MR. ANDERSON:  Yes, Your Honor.

8              THE COURT:  If I understand correctly, Mr. Tedmon,

9    you're not directly challenging the method used to come up with

10   the numbers shown in those first two tables.  You're

11   challenging the grouping.  And you haven't provided an

12   alternative number for the Court.  Do I have that all correct?

13             MR. TEDMON:  Yes.  Could I have one moment, though?

14             (Pause in proceedings.)

15             MR. TEDMON:  Your Honor, if I could make sure I

16   understand this before I give you my answer.

17             Column one, "proceeds to seller," that's fine.

18   Second "proceeds to seller," as I understand it from the

19   Government's explanation just now, is that that is money that

20   was obtained from lenders by taking additional loans out on the

21   property, is that correct, Mr. Anderson?

22             MR. ANDERSON:  We calculate it, Your Honor, as loss

23   to the victims because it's additional equity taken from the

24   victims' homes, just in a second transaction.

25             In some cases, the conspirators only did one

1   transaction to remove equity.  In other cases, they did a

2   second transaction to remove additional equity.

3          THE COURT:  So a subsequent refinance, for example.

4          MR. ANDERSON:  Exactly.  Often in a different

5   straw-buyer's name or disguised as a sale to another straw

6   buyer.

7          MR. TEDMON:  I guess the only question I have then

8   is, the Government's position is that the victim is the

9   homeowner, not the lender, is that what I understand?

10         THE COURT:  The third column, the foreclosure column,

11  is the lender.

12         MR. TEDMON:  I'm focusing on the second column.  The

13  first and third columns we have no actual objection.

14         I'm just still trying to understand what the

15  Government's position is relative to who the victim is in the

16  second "proceeds to seller."

17         MR. ANDERSON:  Our view, Your Honor, is that the

18  victim in the second "proceeds to seller" is the homeowner who

19  is paying rent and believes they own the home but has the

20  equity stripped through additional sale, or, in some cases,

21  through resale to a third party where the conspirators then get

22  the additional equity in that manner.

23         Only the third column is foreclosure loss.  That's

24  the only column that relates to the lender.

25         THE COURT:  That's the Government's explanation.

1          Mr. Tedmon, with that, did you have more to say?

2                    MR. TEDMON:  I submit it, Your Honor.

3                    THE COURT:  With those clarifications, I am prepared

4          to accept the probation officer's calculation of the guidelines

5          range.

6                    As the Government points out, the total offense level

7          amounts to 47, which exceeds the maximum available under the

8          guidelines.  So it becomes 43 by operation of the guidelines.

9          I'm using the criminal-history category of III.

10                   And so then the ultimate question is, after thinking

11         through the sentencing factors, what is the appropriate

12         sentence.  So I would allow the parties to make final

13         arguments.

14                   And just so I'm clear, if it's needed, is Mr. Head

15         waiving any final pronouncement as to forfeiture?

16                   MR. ANDERSON:  Your Honor, we are going to ask that

17         the Court orally make this pronouncement as follows:  The order

18         of forfeiture money judgment filed September 19th, 2013, is

19         hereby made final as to the defendant and shall be incorporated

20         into the judgment.

21                   THE COURT:  That language is in what's proposed.

22                   MR. TEDMON:  Right.  That's accurate.

23                   THE COURT:  All right.

24                   MR. TEDMON:  We submitted the forfeiture matter last

25         year, and that would be a way of finalizing it.

 1                THE COURT:  So no outstanding issues there.

 2                MR. TEDMON:  Not on forfeiture, no.

 3                THE COURT:  Again, I have no further questions.

 4           Mr. Anderson, I understand your position.  Is there

 5      any further argument you would like to make?

 6                MR. ANDERSON:  Your Honor, there is not much we can

 7      add to what the victims have said in this case.  This case was

 8      devastating.

 9                Mr. Head has shown no remorse.  He has shown nothing

10      in mitigation for what he has done.  He doesn't bring to the

11      Court any of the factors that other defendants in this case or

12      other cases bring to the Court regarding the way that they've

13      changed their life, the other good things that they've done,

14      the other things that balance out this bad.

15                All there is in this case is the fraud and his

16      argument that the guidelines create a very, very long sentence.

17      And they do.  But as the Government points out in its

18      memorandum, the guidelines create a long sentence or suggest a

19      long sentence because that's what this case deserves.

20                Mr. Head has gone through and committed a crime

21      against so many people that hits every factor that these

22      guidelines look at almost in determining that a crime is very,

23      very serious and deserves a very, very long sentence.

24                In this case, even the Government's recommended

25      40-year sentence is a huge downward variance from what Mr. Head

1      is due under the guidelines.  The reason the Government

2      recommends that 40-year sentence is because that puts Mr. Head

3      at an age when he is released from custody where it's much less

4      likely that he will commit another offense.  Unfortunately,

5      fraud offenses are often committed by people at a much greater

6      or older age than crimes of violence.

7                In this case, we need a long sentence to keep

8      Mr. Head in custody, protect the public, and to give a just

9      punishment for what he has done in this case to each of the

10     people.  Not only the people that were able to make it here

11     today, but the hundreds of people who were not able to make it

12     here today either because it was too emotionally difficult for

13     them, or they had no financial resources to get here and be

14     before this Court because, in large part, of what happened here

15     in this case.  Thank you.

16               THE COURT:  Mr. Tedmon.

17               MR. TEDMON:  Well, Your Honor, I think a sentence of

18     15 years in each case, to run concurrent, is appropriate.

19     We're not coming in here and asking the Court to slap Mr. Head

20     on the hand and send him on his way.  Fifteen years is a long

21     time.  He will be in his 50s before he gets out.  He is

22     40 years old as he sits here today.

23               As far as a sentence of 40 years goes, I think that's

24     incredibly overreaching for the conduct, and it is out of line,

25     in my view, with the cases, certainly, that I've cited where

1    you have other defendants who went to trial.

2         In each of the four cases I've cited, their guideline

3    range was life, which is what Mr. Head's, based on the Court's

4    decisions, range is.  And in those cases, Christian Milton got

5    48 months, Richard Adelson received 42 months, James Olis

6    received 72 months, Lester Parris and his brother, Lennox,

7    received 60 months.

8         And I'm not coming into this court offending the

9    process by saying Mr. Head should get 42 or 60 months.  We're

10   asking for 15 years.  That is a long time.  And I think to

11   simply throw numbers around is not responsible.  180 months on

12   each case, concurrent, is appropriate.  That is a lengthy

13   sentence by anybody's term.  It's a lengthy sentence in federal

14   court.  And I think it's appropriate taking all the factors

15   into account.

16        And then just as an additional comment, I think the

17   Court should take into account this overstatement of criminal

18   history for purposes of variance.  I also ask the Court to

19   consider that.

20        I would ask the Court to consider two other factors.

21   One, Mr. Head served in the military.  He was in the Army.  I

22   think that's a characteristic of his history that the Court

23   should consider.  He served his country.  Now, he got convicted

24   in these cases, but I think that is a factor that ought to be

25   at least credited on his side and should mitigate, somewhat,

1          the totality of the sentence that he is receiving.

2                    And the last thing is, several of these people that

3          either spoke today or had their letters read consistently said

4          they want their money, they want restitution.  Under the

5          Government's matrix of 40 years, Mr. Head will be about

6          72 years old before he gets out.  That gives them no chance to

7          receive any restitution, and I think that's not appropriate.

8                    Fifteen years is appropriate, concurrent with each

9          other.  That allows Mr. Head to get out at least at a point in

10         time where he can start to work back and get some of these

11         victims their money.

12                   Now the Government may say, well, that's nominal.  It

13         doesn't mean much.  Well, it means a lot to each of these

14         victims.  You heard them testify here today in court.  Some

15         money is better than none.

16                   And I think to marry the concept of appropriate

17         punishment, sufficient but not greater than necessary, 15 years

18         accomplishes that.  It sends a message to the community.  You

19         cannot commit these kinds of crimes.  It deters future conduct.

20         But it also takes into account the victims, which are the

21         people that the Government is putting out before you to try to

22         get them some of their money back.  And I don't think that's an

23         inconsistent or throw-away comment.  I think it's important and

24         the Court should consider that.

25                   I think you take all factors into account, 180 months

1    in case 093, concurrent with 180 months in case 116 addresses

2    the mission of the guidelines, the sentencing factors that are

3    laid out in 3553, and is appropriate taking all facts and

4    situations into account, and I would urge the Court to issue

5    that sentence.

6            As far as the rest of it goes, the only other

7    comments I would make would be to ask the Court to follow the

8    recommendation that Mr. Head be recommended to be incarcerated

9    in an institution in Morgantown, West Virginia, or as close to

10   Pittsburgh, Pennsylvania, as possible, subject to security

11   classification and space availability.  I would submit it on

12   that basis.

13           THE COURT:  Just one question.  On the cases that you

14   cited to the Court, I did check those, as well as the cases

15   cited by the Government in terms of thinking about unwarranted

16   disparities.  Which cases come closest in terms of total

17   restitution?  It seemed to me Murray and Wilson were the two

18   closest, and in those cases the defendants pled, and they got

19   235 -- almost 20 years, each of them.  Fewer counts and pleas.

20           MR. TEDMON:  Are you asking about the cases I cited?

21           THE COURT:  I'm looking at the total set of cases.

22   You rattled off some of the cases.  In some cases there was no

23   -- in Olis there was no restitution.

24           MR. TEDMON:  Well, in the Adelson case, which is U.S.

25   versus Saad, the Court ordered restitution of $50 million.

1      This is certainly less, what we have here.  This is over, what,

2      around 13 million.  And Mr. Adelson received a term of

3      imprisonment of 42 months.  So he's got a significant amount of

4      restitution beyond what we have here, and he received

5      42 months.

6              THE COURT:  Was that a plea?

7              MR. TEDMON:  No.  He was tried.  He was convicted at

8      trial of conspiracy, securities fraud and filing false reports

9      with the SEC.  His guideline loss amount was established

10     between 50 and 100 million dollars, and the Court ordered

11     restitution of $50 million.

12             THE COURT:  So on that one case -- the Court can't

13     focus on any one case -- but what was going in Adelson?  Remind

14     me of those facts.

15             MR. TEDMON:  Well, it was a Southern District of New

16     York case, Your Honor, at about the same timeframe, 2006, is

17     when the trial happened.  Obviously, the facts are before that.

18     And it had to do with conspiracy to commit securities fraud and

19     other related financial matters, filing of false reports.

20             So I think they are -- while the nature of the charge

21     is different, the conduct is similar.  It's a fraud case.

22     There is false documents being provided.  It's perpetuating a

23     fraud.  And in that case, the restitution was $50 million.

24             And I do agree with the Court and, actually, the

25     Government to an extent.  Mr. Anderson mentioned in his brief

1        that, you know, you can put any case you want out there.  The

2        reality is what should happen in this case.  And so to cherry

3        pick a case here and there -- which neither party is trying to

4        do -- we're just giving the Court information -- I think that

5        taking Mr. Head where he sits today and looking at all these

6        cases -- and we can find some that are more severe or less

7        severe -- but I think if you look at the totality of it,

8        15 years is appropriate.

9               I think given the loss that the Court has now imposed

10       under the guidelines, the restitution that we've discussed,

11       which in some cases was higher, in some cases lower than other

12       cases that have been provided to the Court, and I think

13       15 years as an aggregate sentence is appropriate taking all

14       those factors into account in terms of disparity.

15              THE COURT:  Understood.  Anything on that last issue,

16       the unwarranted the disparity and the cases the Court looks to?

17              MR. ANDERSON:  Yes, Your Honor.  The way to avoid an

18       unwarranted disparity in this case is what Treadwell points the

19       Court to, which is to follow the guidelines here.

20              The reason why we can't point to any other case that

21       really is analogous and would avoid an unwarranted disparity is

22       that there aren't cases like this out here.

23              What the defendant did in this particular case is so

24       much worse in so many ways than the cases that Mr. Tedmon cited

25       or even the cases the Government cited.  He stole people's

1    homes out from under them.

2            The guidelines here are able to account for that

3    through a lot of different variables, but in some ways they

4    can't even account for that level of harm, the personal,

5    destructive nature of what he did to these people.

6            There is just no way to point to some securities law

7    violation and say that that's in any way analogous to what is

8    happening here.  It's not.  This is different.  But at least in

9    this case, the guidelines are a way that the Court can look and

10   try to avoid a disparity with any other case.

11           As far as restitution, what the Government has said

12   before is the same.  There is no way he's ever going to be able

13   to pay these people back even pennies on the dollar.  Even if

14   he paid $100,0000 a year, which is completely unrealistic, it's

15   going to take a 130 years.  It's going to take forever to pay

16   it back.  There is no way it's going to happen.

17           And we know it's not going to happen also because of

18   Charles Head.  He's been out for years.  He was even out,

19   released temporarily, after he was convicted in the first case,

20   and we haven't seen a dime.  There is no check here today.

21   There is no money to pay the victims back.  If he had any

22   intention of paying the victims back, I think we would have

23   seen something of that by now.

24           There is just no way that restitution is a reason

25   that he should spend less time in prison.  It's a false

1    promise.  Submitted.

2              THE COURT:  All right.  Mr. Head does have the right

3    to allocute before I impose a sentence.

4              Mr. Head, is there anything that you would like to

5    say to the Court at this time?

6              THE DEFENDANT:  No, Your Honor.

7              THE COURT:  And I haven't received anything in

8    writing from Mr. Head either.

9              MR. TEDMON:  No.

10             THE COURT:  All right.  The final way in which the

11   Court channels its discretion in determining the appropriate

12   sentence is to consider the sentencing factors that the U.S.

13   Congress has adopted.

14             I would like to review those for the record.  I'd

15   also like to clarify that I am, clearly, only sentencing

16   Mr. Head today, Charles Head.  I've heard references to other

17   names, other co-defendants.  Their sentencings will occur, the

18   Court hopes, in the relatively near future.  I have asked

19   Probation to do what it can to keep all of those sentencings on

20   track to occur this fall, because I do think it's important

21   that we bring the entirety of this case to closure.  But I'm

22   only sentencing Mr. Head today.  He is, in the Court's mind,

23   the lead defendant in both cases.

24             The sentencing factors first focus on the nature of

25   the offense, the circumstances, Mr. Head's history and

1        characteristics.

2                Just to note, it does appear that Mr. Head had a

3        fully-functional family upbringing.  He still enjoys family

4        support.  He is a citizen.  I wanted to make that clear, given

5        one of the letters.  I wasn't certain if there was some lack of

6        clarity about that.  He is a citizen of this country.  He did

7        serve in the Army for a period of time and was honorably

8        discharged.

9                There was some reference to his having made

10       contributions to certain charitable operations, but the Court

11       has received no meaningful detail in that respect.

12               He did obtain some post-secondary education, but it

13       does appear to the Court that he used what he learned in that

14       education in a way that led to the scheme that has him before

15       the Court this morning.

16               Mr. Head has not expressed any remorse.  I understand

17       his position that he is innocent of the charges, but he does

18       stand convicted by two separate juries through trial

19       proceedings over which this Court presided.  And so the Court

20       is, of course, accepting the jury's determination of that

21       question.  Mr. Head has the right to retain his position, but

22       he does stand convicted of nine separate counts and for

23       activity that occurred over a two-year period at least,

24       two-plus years.

25               And the Court has to say that taking into account

1    both the testimony the Court heard during trial, but also the

2    statements of the victims -- both statements provided in

3    writing, which I have read carefully, and then I've heard them

4    again, at least some of them, in court here today -- there is a

5    remarkable consistency, and I have to assume that the many

6    different persons submitting those statements did not

7    coordinate in advance.

8              Even if others contributed to their loss and

9    stress -- and there has been reference to attorneys, lenders.

10   And the Court assumes there were others who contributed to

11   their loss and stress.  Even if they found themselves in

12   financial situations that could not have worked its way out for

13   them, even if Mr. Head is being scapegoated in some manner for

14   many different issues, when the Court focuses on just what

15   Mr. Head did here, and focuses on that, it has to be said that

16   he did create -- and he did create and implement a very cynical

17   credit repair scheme.

18             Because of the nature of those he targeted through

19   targeted mailings, using an efficient postcard method, he

20   naturally identified people who were very vulnerable.  The

21   Court has heard this morning and has read in the letters of the

22   victims the human dimension of that vulnerability.  There are

23   many different reasons why folks found themselves to be so

24   vulnerable.  Sometimes it was health.  Sometimes it was family

25   member's health, loss of a job.  Often those persons went

1        looking for the right fit for their particular distress

2        situation, and they found Mr. Head.

3                He not only took advantage of them, he took advantage

4        of gaping holes in the system.  It's undeniable there were

5        holes in that system, the lending system, but Mr. Head found a

6        way to take advantage of those.

7                And then the result -- again, without pinning every

8        single effect that the Court has heard.  I don't doubt that all

9        of these things have happened to all of the victims.  But

10       looking at the direct effects of what Mr. Head did and had his

11       associates do, there are clearly domino effects.  Persons

12       turned to attorneys, tried to find attorneys.  They had

13       personal stress related to the seizure of their homes.

14               It's clear that even if the paperwork -- which the

15       jury had a chance to review -- even if the paperwork said in

16       the relatively fine print that homeowners were transferring the

17       title of their homes, that is not what homeowners heard.  They

18       were not given the time to think through clearly what was going

19       on.  There was damaged credit as a result.  And ultimately, for

20       many, in fact most of the victims, there was loss of a home,

21       which was central to their personal and financial stability.

22       And so the nature of the offense is a very serious one and

23       argues for a very significant sentence.

24               In terms of the second sentencing factor reflecting

25       the seriousness, I've just indicated that there is a need for a

1    significant sentence to reflect the seriousness, to promote

2    respect for the law.

3            And although Mr. Head does get credit for having

4    served in the Army, for having been honorably discharged, his

5    life since then has shown some inability to fully respect the

6    law.  Without further commenting on his current claim of

7    innocence, during his time on pretrial release it hasn't been

8    disputed by the defense that there were misrepresentations made

9    to the Court as to what he was doing during that period of

10   pretrial release.

11           This is not to put any blame on Mr. Tedmon.

12   Mr. Tedmon, the Court assumes, was relaying what Mr. Head was

13   telling him.  And Mr. Head was giving him incorrect information

14   as to his activities.

15           There's been no claim here of any need for substance

16   abuse or mental health treatment.  There have been times when

17   I've wondered if there's a mental health issue, but there is no

18   claim of that and nothing that would support the Court taking

19   account of that in the conditions that I impose on any term of

20   supervised release.

21           The sentencing factors also ask me to consider the

22   kinds of sentencing available.  The effective range here, given

23   the parties' request, is 15 years to 40 years, total.  That is

24   the range in which the Court is focusing its attention.  I

25   think it's the appropriate range.

1          I have considered, as I've mentioned, the guidelines,

2    the guidelines policy statements.  I have considered other

3    cases, including cases from this district, but cases throughout

4    the country, where there are similar types of charges.  I've

5    looked at the restitution amounts awarded.

6          It is important that the Court attempt to avoid

7    unwarranted disparities, to make certain, all things

8    considered, that I'm treating Mr. Head equally and fairly under

9    the law.

10          With respect to restitution, I will be making a

11    restitution award.  That's the final sentencing factor.  We

12    will set a hearing date for final determination.

13          That restitution award will be at least in the amount

14    of $13,287,093.42.  But I am concerned that certain names

15    aren't showing up on the list I've been provided, so I'm going

16    to ask for the Government's assistance, with review by the

17    defense, to finalize the exact dollar amount and the persons to

18    receive restitution, if it is ever forthcoming.

19          So all of that said, I am narrowing my focus to a

20    range of what Probation recommends.  And Probation has intimate

21    familiarity with the types of sentences that avoid unwarranted

22    disparities and achieve the goals of the guidelines, even as

23    they are advisory.

24          So 180 months on each case is the minimum I would

25    impose.  I have considered going to 210 months per case as the

1    maximum I would impose.

2              And all things considered, taking into account the

3    sentencing factors, taking into account the defense argument

4    for a variance and noting the defenses -- as Mr. Tedmon has

5    indicated, the Court does credit his statement that he's not

6    disrespecting the Court.  Mr. Head is not disrespecting the

7    Court in arguing for a 15-year sentence, combined.

8              But that said, given the lack of expression of any

9    remorse and the very significant domino effects, I am going to

10   go to the 210 months per case.

11             So all of that said, it is the judgment of this

12   Court, Charles Head, that you are hereby committed to the

13   custody of the Bureau of Prisons to be imprisoned in docket

14   number 2:08-cr-093-1 for a term of 210 months on each of

15   Counts 1 through 3, 5 and 6, to run concurrently within that

16   case, and in docket number 2:08-cr-116-1 for a term of

17   210 months on each of Count 1 through 4, all to run

18   concurrently.  Again, that's within that case, but

19   consecutively to the sentence imposed in 08-93.  For a total

20   term of 420 months.

21             You shall pay a special assessment of $900.  That's

22   the $100 per count mandatory assessment required by the

23   statute.  That payment is due immediately.

24             I find at this point in time that you do not have the

25   ability to pay a fine.  Imposition of a fine is waived.

1          As I indicated, I will be ordering restitution.

2          The order for forfeiture money judgment filed on

3    September 19th, 2013 is hereby made final as to Mr. Head and

4    shall be incorporated into the judgment in 08-93-1.

5          Upon release from imprisonment, Mr. Head shall be

6    placed on supervised release for a term of 36 months on each of

7    Counts 1 through 3, 5 and 6 in 08-93, and 36 months on each of

8    Counts 1 through 4 in 08-116.  All to run concurrently to each

9    other.  That's for a total term of 36 months of supervised

10   release.

11         Within 72 hours of release from custody, Mr. Head,

12   you shall report in person to the probation office in the

13   district to which you are released.

14         While on supervised release, you shall not commit

15   another federal, state, or local crime.  You shall not possess

16   a firearm, ammunition, destructive device, or any other

17   dangerous weapon.

18         You shall not illegally possess controlled

19   substances.  You shall cooperate in the collection of DNA as

20   directed by Probation.  And you shall comply with the standard

21   conditions recommended by the United States Sentencing

22   Commission and adopted by this Court.  Those are conditions 1

23   through 13.  They are attached to your PSR.  They are imposed

24   as written.

25         In light of Probation's clarification, I'm retaining

1       the language about substance abuse.  You shall refrain from any

2       unlawful use of a controlled substance.  You shall submit to

3       one drug test within 15 days of release and at least two tests

4       thereafter, not to exceed four per month.

5               I am also imposing the special conditions, conditions

6       1 through 8 as set forth on page 23.  They are imposed as

7       written.  If the probation officer ultimately determines that

8       you don't require substance abuse monitoring, then Probation

9       can come forward and recommend that those conditions be lifted.

10              I am prepared to recommend that you be incarcerated

11      at an institution in Morgantown, West Virginia, or as close as

12      possible to Pittsburgh, Pennsylvania, insofar as that

13      recommendation accords with security classification and space

14      availability.

15              What is the date we're setting for restitution,

16      Ms. Schultz?  Is that 60 days out at this point?

17              THE CLERK:  Sixty days out, Your Honor, would be

18      October 29th, 2014.

19              THE COURT:  Is that acceptable?

20              MR. ANDERSON:  Your Honor, can we go to the 22nd, if

21      available?

22              THE CLERK:  That date is available, Your Honor.

23              THE COURT:  Would Mr. Head waive appearance at the

24      restitution hearing, or would he want to be present?

25              MR. TEDMON:  He will waive appearance, Your Honor.

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1    The 22nd of October is fine.  If we can come to some sort of

2    agreement, we'll try to reduce it to a stipulation, proposed

3    order, and provide it to Court, and then we can vacate that

4    hearing date.

5              THE COURT:  All right.

6              MR. TEDMON:  And we'll work with the Government in

7    that regard.

8              THE COURT:  The restitution hearing is set for

9    October 22nd.  That may be vacated if the parties reach an

10   acceptable stipulation, but it should address the persons who

11   the Government is confident are victims but not clearly

12   identified to either case, including persons who appeared here

13   today or submitted letters making a claim for restitution.  So

14   if those can be itemized.

15             And then the parties should also, if they do submit a

16   stipulation, make a recommendation for the Court as to the kind

17   of statement the Court can make in a written order, or, if the

18   U.S. Attorney is prepared to provide the victim something in

19   writing that they can use with employers and future lenders,

20   you can let the Court know, or, if you appear, be prepared to

21   provide information on that score.

22             Mr. Head, it does appear that you retain the right to

23   appeal, and, therefore, so you are clear, if you wish to file a

24   notice of appeal of the sentence just imposed, you must file a

25   notice within 14 days of today's date.  If you cannot afford

1          counsel on appeal, the Court will appoint counsel for you.

2                    Is there anything else today, Mr. Tedmon?

3                    MR. TEDMON:  Yes, one other thing, Your Honor.  On

4          the appellate matter, I would ask that the Court relieve me

5          today in both cases.  I have spoken to Kurt Heiser from the

6          Federal Defender's Office.  He either has somebody already

7          selected to represent Mr. Head on appeal in both cases, but,

8          for the sake of the record in the Ninth Circuit, if the Court

9          does not relieve me today, then I will be the attorney of

10         record, and I will not be doing the appeal.  So if the Court

11         will do that, I will follow up and insure that a notice of

12         appeal gets filed timely.

13                   THE COURT:  That request is granted.  Mr. Tedmon is

14         relieved as counsel in both cases.

15                   Is there anything further today, Mr. Anderson?

16                   MR. ANDERSON:  Your Honor, I apologize if I missed

17         it, but the order regarding forfeiture, was that read into the

18         record?

19                   MR. TEDMON:  I believe it was.

20                   MR. ANDERSON:  I apologize.

21                   THE COURT:  I skipped the restitution paragraph

22         because we will amend the judgment once the final restitution

23         amount is determined.

24                   MR. ANDERSON:  Thank you, Your Honor.

25                   THE COURT:  Thank you very much.  We are in recess.

```
 1                    MR. TEDMON:  Your Honor --

 2                    THE COURT:  We're not in recess.

 3                    MR. TEDMON:  Your Honor, there is just one other

 4      brief thing.

 5                    Mr. Head's been transferred from Colusa County to the

 6      Sacramento County Jail, and we have had no problems.  He needs

 7      his contacts.  He needs them to function.  Colusa County has

 8      been fine.  He's now in Sacramento County.  If he stays there,

 9      they require an order allowing us to get him contacts from the

10      Court.  We have visited this once before.  Should I take that

11      up with the magistrate, or can the Court issue an order that he

12      be allowed to get his contacts?

13                    THE COURT:  Bring that up with the duty magistrate.

14      Can you do that even as you've been relieved?

15                    MR. TEDMON:  I'll do that pro bono, if necessary.

16                    THE COURT:  Why don't you submit a proposed order to

17      the magistrate judge, and if they have any question, they can

18      forward it to me.  Thank you.

19                    (Court adjourned.  12:51 p.m.)

20

21

22

23

24

25
```

1                              CERTIFICATION

2

3              I, Diane J. Shepard, certify that the foregoing is a

4       correct transcript from the record of proceedings in the

5       above-entitled matter.

6

7

8                                        /s/ DIANE J. SHEPARD
                                         DIANE J. SHEPARD, CSR #6331, RPR
9                                        Official Court Reporter
                                         United States District Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25