UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:08-cr-00093-KJM |
| Plaintiff, | No. 2:08-cr-00116-KJM |
| v. | ORDER |
| Charles Head, | |
| Defendant. | |

Charles Head again moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). He asserts his elderly parents can no longer take care of his minor son, J.H., and this warrants a reduction in his sentence. *Head I*[1] Mot., ECF No. 1914; *Head II* Mot., ECF No. 1144. The government opposes. Opp'n, ECF No. 1921. For the following reasons, the court **denies** the motion.

I.    **BACKGROUND**

As the court has previously explained, Charles Head was the leader and organizer of two large and complex mortgage fraud schemes: a foreclosure rescue scheme and an equity stripping

---

[1] In this order, the court will continue the convention used in its past orders referring to this case (case number 2:08-cr-00093-KJM) as "*Head I*." The court will refer to Head's second case (case number 2:08-cr-00116-KJM) as "*Head II*." As explained below, Head moves for compassionate release in both matters.

1

scheme. *See* Presentence Investigation Rep. (PSR) ¶¶ 1–23, ECF No. 978; Order (June 7, 2022), ECF No. 1792. These schemes preyed on homeowners in financial distress. *Id.* ¶¶ 3, 11. Head trained and organized his coconspirators to solicit vulnerable owners and lenders and defraud them of their home equity. *Id.* ¶¶ 4, 6, 13, 16. In total, Head and his coconspirators defrauded "at least 330 victim homeowners" out of tens of millions of dollars. *Id.* ¶ 18.

Head faced two jury trials related to each of these schemes. On May 30, 2013, Head was found guilty of conspiracy to commit mail fraud and four counts of mail fraud related to his "foreclosure rescue" scheme. *Head I* Verdict, ECF No. 773. On December 2, 2013, a different jury found Head guilty of conspiracy to commit mail fraud and three counts of mail fraud related to his "equity stripping" scheme. *Head II* Verdict, ECF No. 463. In total, Head was convicted of seven counts of mail fraud and two counts of conspiracy to commit mail fraud. In September 2014, the court sentenced Head to 210 months for his conviction in *Head I*, and 210 months for his conviction in *Head II*. *See Head I* J. & Commitment, ECF No. 983; *Head II* J. & Commitment, ECF No. 583. The court ordered the sentences to run consecutively for a total of 420 months, or 35 years, a 145-year downward variance from the 180-year Guidelines maximum. *See Head I* J. & Commitment at 3[2]; *Head II* J. & Commitment at 3. The court also ordered Head to pay a total of $17,097,950.47 in restitution. *See Head I* Am. J. at 6, ECF No. 1191 ($9,534,240.21); *Head II* Am. J. at 6, ECF No. 653 ($7,563,710.26).

In 2021, Head moved to reduce his 420-month sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i). *See generally* Mot. (Apr. 20, 2021), ECF No. 1734. This request was primarily based on Head's personal health and risk of infection with COVID-19. *See id.* at 20–31. In 2022, the court denied this motion. *See generally* Order (June 7, 2022). The court did not address the question of Head's susceptibility to COVID-19 and reached its decision by weighing the relevant § 3553(a) sentencing factors. *See id.* at 3–4. The factors did not weigh in his favor, resulting in the court's denial of his motion for compassionate release. *See id.* at 4–8.

---

[2] When citing page numbers on filings bearing the pagination automatically generated by the CM/ECF system, the court uses the CM/ECF pagination.

1   Now, almost four years after Head filed his previous motion, he once again moves for a
2   reduction in his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). *See generally* Mot. This time,
3   Head argues his elderly parents have become incapacitated and can no longer care for his minor
4   child, J.H.[3] *See id.* at 16–23. J.H. has significant behavioral issues, including diagnoses of
5   Autism Spectrum Disorder (ASD), Disruptive Mood Dysregulation Disorder (DMDD), severe
6   Attention Deficit Hyperactivity Disorder (ADHD) and Reactive Attachment Disorder (RAD).
7   *See* Mot. Ex. D, ECF No. 1914-1; Mot. Ex. P at 11 (under seal). Head believes his parents can no
8   longer accommodate J.H.'s needs due to their ages and personal health conditions. *See* Mot.
9   at 16–23. The government opposes, arguing Head's parents are not incapacitated, and even if
10  they are, alternate caregivers are available to care for J.H. *See generally* Opp'n. Head responded.
11  *See generally* Reply, ECF No. 1929. The parties filed identical briefings in *Head II*. *See*
12  *generally Head II* Mot. (Dec. 30, 2024), ECF No. 1144; *Head II* Opp'n, ECF No. 1153; *Head II*
13  Reply, ECF No. 1165. Because the motions are the same across the two criminal matters, the
14  court addresses both here.

15  **II.   LEGAL STANDARD**

16  The district court that imposed a custodial sentence may modify the term of imprisonment
17  under 18 U.S.C. § 3582(c)(1)(A). When a defendant moves for compassionate release, a district
18  court may, in its discretion:

> [R]educe the term of imprisonment if four conditions are met:
> (1) the defendant exhausted administrative remedies;
> (2) "extraordinary and compelling reasons" warrant a sentence
> reduction; (3) a sentence reduction is "consistent with applicable
> policy statements" issued by the U.S. Sentencing Commission; and
> (4) the district court considered the factors set forth in 18 U.S.C.
> § 3553(a).

26  *United States v. Chen*, 48 F.4th 1092, 1094–95 (9th Cir. 2022) (quoting § 3582(c)(1)(A)).
27  The absence of any of these conditions precludes the court's granting the defendant's
28  motion. *See United States v. Bryant*, No. 24-3093, slip op. at *1 (9th Cir. July 21, 2025); *United*

---

[3] Head's motion uses his child's full name. *See generally* Mot. The government's opposition uses the child's initials, "J.H." *See generally* Opp'n. To preserve the minor's privacy here, the court refers to Head's child as "J.H."

3

1    *States v. Wright*, 46 F.4th 938, 945 (9th Cir. 2022).  The defendant bears the burden of
2    "establish[ing] his eligibility for compassionate release." *Wright*, 46 F.4th at 951.
3         In November 2023, the Sentencing Commission updated its policy statement regarding
4    reductions to terms of imprisonment and § 3582(c)(1)(A).  *See* U.S.S.G. § 1B1.13.  It amended
5    the statement to encompass motions made by both the Director of the Bureau of Prisons and
6    individual defendants.  U.S.S.G. § 1B1.13(a).  Prior to November 2023, courts were not bound by
7    the policies set forth in U.S.S.G. § 1B1.13 when addressing motions made by defendants and not
8    the BOP.  *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021).  District courts,
9    nevertheless, frequently looked to the Sentencing Guidelines as persuasive authority for motions
10   brought by defendants.  Now, courts must consider § 1B1.13 "in deciding all compassionate
11   release motions under § 3582(c)(1)(A)." *Bryant*, slip op. at *2 n.1 (superseding *Aruda* on the
12   applicability of § 1B1.13 to defendant-filed motions).
13        The Sentencing Commission also identified six broad categories as providing
14   "extraordinary and compelling reasons" for sentence reduction in these updates.  *Id.* § 1B1.13(b).
15   Relevant provisions provide that "[t]he death or incapacitation of the caregiver of the defendant's
16   minor child" and "any other circumstance or combination of circumstances that, when considered
17   by themselves or together . . . , are similar in gravity" are extraordinary and compelling reasons.
18   *Id.* § 1B1.13(b)(3)(A), (5).
19        The amendments described above appear to have created some confusion with respect to
20   the nature of the defendant's burden to show the availability of an alternative caregiver for his
21   child.  The parties disagree about the applicable standard.  *See* Mot. at 18–19; Opp'n at 5, 14–15;
22   Reply at 1.  The court therefore considers the proper standard here.  Prior to the amendments,
23   many courts required defendants to demonstrate they were the only available caretaker for their
24   child.  *See, e.g.*, *United States v. Masterson*, No. 18-CR-00010, 2021 WL 1697516, at *2 (E.D.
25   Cal. Apr. 29, 2021); *United States v. Sua*, No. CR 20-00071, 2023 WL 2758748, at *2–3 (D.
26   Haw. Apr. 3, 2023).  Since the amendments, district courts in the Ninth Circuit have diverged in
27   their reasoning.  *Compare United States v. Smith*, No. 21-CR-00279, 2024 WL 4556521, at *4, *6
28   (D. Nev. Oct. 22, 2024) (finding U.S.S.G. § 1B1.13(b)(3)(A) "makes no requirement regarding an

4

1  alternative caregiver" and the defendant "need not prove that he is the only or best available
2  caretaker for [his child]"), *and United States v. Lanphear*, No. CR 19-19, 2024 WL 97369, at *2
3  (D. Mont. Jan. 9, 2024) (holding "there is no requirement that the defendant be the child's only
4  available caregiver"), *aff'd,* No. 24-346, 2024 WL 4562802 (9th Cir. Oct. 24, 2024), *with United*
5  *States v. Hall*, No. 20CR867, 2024 WL 4547008, at *2 (S.D. Cal. Oct. 22, 2024) (denying
6  compassionate release where defendant "failed to make the required showing that he is the only
7  available caregiver for his daughter"), *and United States v. Jah*, No. CR 19-00026, 2025
8  WL 1580868, at *3 (N.D. Cal. June 4, 2025) (finding no extraordinary and compelling reason for
9  sentence reduction where defendant fell short of the "robust evidentiary showing that [he] [was]
10 the only available caregiver").

11    Given that the Ninth Circuit has yet to decide which approach is correct, the court deems
12 it appropriate to analyze the words of the Sentencing Commission's policy in accordance with
13 fundamental canons of statutory interpretation. *See United States v. Herrera*, 974 F.3d 1040,
14 1047–48 (9th Cir. 2020) ("using the ordinary tools of statutory interpretation" in reading the
15 Sentencing Guidelines). The plain meaning of U.S.S.G. § 1B1.13(b)(3)(A) does not allow the
16 court to impose a requirement that the defendant be the only available caregiver for their child.
17 Unlike § 1B1.13(b)(3)(B)–(D), subsection (A) does not employ the phrase "when the defendant
18 would be the only available caregiver." The court declines to read this phrase into subsection
19 (A) because "[i]f the Sentencing Commission sought to limit section 1B1.13(b)(3)(A)'s
20 applicability to circumstances where the defendant is the only available caregiver, it would have
21 said so." *United States v. Cunningham*, No. CR 18-017, 2024 WL 4057004, at *9 (D. Md. Sept.
22 4, 2024). That is, the court determines U.S.S.G. § 1B1.13(b)(3)(A) does not require Head to
23 show there are no alternative caretakers, but such a showing may be considered in the court's
24 discretion as an additional extenuating circumstance. *See* U.S.S.G. § 1B1.13(b)(5).

25 **III.    ANALYSIS**

26    The government agrees that Head has exhausted his administrative remedies as required
27 by 18 U.S.C. § 3582(c). Mot. at 16; Opp'n at 11. Thus, the remaining questions are whether
28 (1) Head's motion is supported by "extraordinary and compelling" reasons, (2) Head's motion is

5

consistent with policies set forth by the Sentencing Commission and (3) the relevant § 3553(a) sentencing factors weigh in Head's favor. The court analyzes the first and second questions concurrently as the relevant Sentencing Commission policies inform the court in determining if Head has identified extraordinary and compelling reasons for release now.

### A.     Extraordinary and Compelling Reasons for Release

Head presents a variety of circumstances he asserts are extraordinary and compelling reasons for early release. Mot. at 16–25. Primarily, he argues that his father and stepmother are incapacitated and can no longer care for Head's minor child, J.H., as his legal guardians. *Id.* at 16. He further asserts that he suffered a "trial penalty," resulting in an "unduly harsh" sentence. *Id.* at 25. The government contests both of these arguments. Opp'n at 12–16. They argue J.H.'s guardians are not incapacitated and even if they were, Head has not shown he is the only available caretaker. *Id.* at 12–15. Moreover, they assert Head's 420-month sentence is appropriate considering Head's criminal history and leadership role in the fraud schemes. *Id.* at 15–16. The court begins with a discussion of Head's family circumstances, specifically the status of his parents' ability to care for J.H.

The death or incapacitation of the caregiver of the defendant's child is one of four family circumstances considered extraordinary and compelling by the Sentencing Commission. *See* U.S.S.G. § 1B1.13(b)(3)(A)–(D). The Sentencing Guidelines do not provide a definition of "incapacitation" within this policy statement. As a result, many courts, including this one, have looked to the BOP's Program Statement on Compassionate Release for guidance. *See, e.g.*, *United States v. Castle*, No. 15-CR-00190, 2024 WL 5159628, at *1 (E.D. Cal. Dec. 18, 2024), *aff'd,* No. 25-133, 2025 WL 1894827 (9th Cir. May 28, 2025); *United States v. Montoya*, No. 20CR2914, 2024 WL 3610962, at *1 n.2 (S.D. Cal. July 30, 2024). The Program Statement defines "incapacitation" to mean "suffer[ing] a severe injury (e.g., auto accident) or suffer[ing] from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." BOP Program Statement No. 5050.50 ¶ 5.[4] As one district court has explained, "[t]he bar to show

---

[4] Federal Bureau of Prisons, Program Statement No. 5050.50, *Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*

1    incapacitation is a high one, and some courts have found that where a caretaker, 'although with
2    some difficulty, is still able to clothe, feed, and shelter their children[,]' a defendant is not entitled
3    to compassionate release under § 1B1.13(b)(3)(A)." *United States v. Smith*, No. 2:21-CR-00279-
4    CDS-EJY, 2024 WL 4556521 at *5 (D. Nev. Oct. 22, 2024).  The BOP Program Statement also
5    addresses when a child is in foster care, and requires documentation that a defendant will be able
6    "to immediately obtain custody of the child" upon release.  BOP Program Statement No. 5050.50
7    ¶ 5(b).  Ultimately, the proper inquiry all things considered  is whether a defendant has
8    demonstrated affirmatively that he would be a "suitable caretaker." *United States v. Paul*,
9    No. 3:18-cr-00227, 2020 WL 5807343 at * 1 (S.D. W.Va. Sept. 25, 2020); *see also United States*
10   *v. Johnson*, No. 1:15-CR-00059-NONE, 2020 WL 6075867 at *5 (E.D. Cal. Oct. 15, 2020)
11   (citing *Paul*, 2020 WL 5807343).

12           Under the applicable statute and guidelines, as properly interpreted, Mr. and Mrs. Head
13   are not incapacitated.  Their medical records indicate both have significant health concerns—
14   which the court does not discount—including hypertension, asthma and autoimmune hepatitis.
15   Mot. at 17; Mot. Exs. Q–V (under seal).  While the court acknowledges the very real hardship
16   caring for J.H. has placed on the Heads, as a matter of law their ailments do not rise to the level
17   supporting defendant's release.  *See* Mot. Exs. R, S, T (under seal) (vital signs and motor
18   functions within defined medical limits for their ages); *id.* Ex. Q at 49–51 (under seal) (self-
19   reports of overall "good" health, with ability to independently carry out daily activities and
20   exercise regularly); *see also id.* Ex. T at 51–52 (under seal).  They do not clear the high bar to
21   showing incapacitation.  *Smith*, 2024 WL 4556521, at *5; *see also United States v. Brown*,
22   No. CR19-106, 2024 WL 1255996, at *5–6 (W.D. Wash. Mar. 25, 2024) (reasoning "a
23   caregiver's difficulty in caring for a minor child is not the same as inability to do so").  Even with
24   J.H.'s substantial specialized needs in mind, which include psychological care and close
25   supervision, *see* Mot. Exs. B–D, ECF No. 1914-1, the record does not show the Heads are

---

(Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The court takes judicial notice of this publicly available statement of a government agency's policy.  *See* Fed. R. Evid. 201(b).  While not binding, the court refers to it as persuasive guidance.

incapable of clothing, feeding, sheltering or otherwise caring for him as he needs. Thus, the court declines to deem Mr. and Mrs. Head presently incapacitated under U.S.S.G. § 1B1.13(b)(3)(A). Defendant's parents' circumstances do not provide extraordinary and compelling reason for his early release.

Indeed, all the cases Head cites in support of finding his parents incapacitated are distinguishable. Of the nine cases referenced, the majority of which come from district courts outside of the Ninth Circuit, only two present facts somewhat similar to the circumstances here. In *United States v. Kesoyan*, the defendant was granted compassionate release where her family members could no longer care for her developmentally disabled son. No. 15-CR-236, 2020 WL 2039028 (E.D. Cal. Apr. 28, 2020). Her child, though twenty-four years old, required constant supervision and assistance with daily activities. *Id.* at *4. His conditions worsened upon the defendant's incarceration "as a direct result of her absence" and inadequate care from his father, paternal grandmother and older brother. *Id.* at *4–5. These guardians suffered from physical disability, drug addiction and dementia, inhibiting their ability to care for the basic, everyday needs of the defendant's child. *Id.* at *4.

Unlike the defendant in *Kesoyan*, Head has been incarcerated for the vast majority of J.H.'s life. *See* Opp'n Ex. 1 at 5, ECF No. 1921-1. Mr. and Mrs. Head assumed guardianship of J.H. when he was fourteen months old. Mot. at 16; Opp'n at 13. Although J.H.'s psychologist attributes some of J.H.'s behavior to "neglect and abandonment in early childhood," the record does not support a causal connection between Head's absence and J.H.'s behavioral decline as in *Kesoyan*. *See* Mot. Ex. D. The health of Mr. and Mrs. Head also is distinguishable from the health of the legal guardians in *Kesoyan*. In *Kesoyan*, the child's guardians suffered from severe mental and physical disabilities, which affected their ability to care for themselves and the defendant's child. *Kesoyan*, 2020 WL 2039028, at *4. Here, Mr. and Mrs. Head are not physically or mentally incapacitated. As described above, they are able to care for J.H. although their responsibilities are now placing significant burdens on them. Thus, the circumstances presented in Head's motion are not comparable to *Kesoyan*.

Head also cites *United States v. Morrison* as a case with similar circumstances to his own. 501 F. Supp. 3d 957 (D. Nev. 2020). In *Morrison*, the court granted the defendant's motion for compassionate release, allowing her to return home to care for her children. *Id.* at 960. During her incarceration, the defendant's two minor children were under their grandmother's care. *Id.* at 959. Like J.H., the children in *Morrison* "[had] their own health considerations that need[ed] attention and ongoing doctors' appointments." *Id.* However, in *Morrison,* the grandmother caretaker suffered from "spinal stenosis and degenerative disc disease" rendering her "unable to sit or stand for long periods of time." *Id.* Mr. and Mrs. Head do not have similar physical ailments. Additionally, the court in *Morrison* found the "caregiving relationship" between the defendant's children and their grandmother had "flip-flopped," *id.*, unlike here. Considering the significant differences between the caretaker in *Morrison* and Mr. and Mrs. Head, the case is not analogous. *See also United States v. Kataev,* No. 16 CR. 763-05 (LGS), 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020) (caregiver could not care for defendant's wheelchair-bound child because caregiver's own illnesses prevented her from "lift[ing] any weight greater than 20 lbs"); *United States v. Howell*, No. 18-CR-0481-WJM, 2020 WL 7260740, at *1–2 (D. Colo. Dec. 10, 2020) (stage IV cancer, hip replacement surgery and inability "to perform basic tasks . . . without assistance" rendered caregiver of defendant's children incapacitated).

In reaching the conclusion that Mr. and Mrs. Head are not incapacitated, the court does not mean to suggest they must continue to care for J.H. The court acknowledges the toll his care has taken and is taking on the Heads, who are not young and who appear to meet the highest standards of responsibility and good citizenship. It is for them, with the support and counsel of their family and friends residing in their community, to determine what is realistic and best for them, taking account of J.H.'s ongoing needs. The court understands they believe foster care may be the only option available for J.H. at this point. Without making any finding to that effect, the court reiterates that if this is the case, it is not a basis for granting compassionate release to Head based on the record before the court. Fundamentally, Head himself has not demonstrated he is a suitable caretaker for J.H. He makes only conclusory arguments in support of his position, which are insufficient. Mot. at 21–22; *see Johnson*, 2020 WL 6075867, at *5 (representations regarding

9

housing, employment, specific childcare arrangements unsupported by evidence; custodial rights not verified). The court has reviewed the many declarations from family members, and accepts their sincere belief that J.H. would be better off if reunited with his father. *See, e.g.*, Mot. Ex. B ¶ 6; Mot. Ex. C ¶ 4. But the record does not allow the court to conclude that Head's reappearing in J.H.'s life after having been absent since J.H was fourteen months old, will ensure that he receives the kind of attention and tailored caregiving he needs and deserves.

Moreover, the length of Head's sentence is not an extraordinary and compelling reason warranting his early release. While the court of course was not engaged in plea negotiations, Head and the government agree the government originally offered a 240-month sentence in the form of a plea agreement, prior to trial. Mot. at 25; Opp'n at 15. He argues the disparity between this offer and the 420-month sentence he received reflects a penalty for "exercising his right to proceed to trial." He refers the court to the Sentencing Commission's catch-all provision, U.S.S.G. § 1B1.13(b)(5), arguing the combination of this "penalty" and his family circumstances create a compelling reason for his release. Mot. at 25; Reply at 3. The court is not persuaded. "Incentives for plea bargaining are not unconstitutional merely because they are intended to encourage a defendant to forego constitutionally protected conduct." *United States v. Narramore*, 36 F.3d 845, 847 (9th Cir. 1994). Head concedes "there are legitimate reasons for defendants convicted after trial to get longer sentences than those who enter a guilty plea." Mot. at 25 n.13. As emphasized in the court's previous order addressing Head's prior motion for compassionate release, "there was good reason for Head's receiving the greatest sentence." Order (June 7, 2022) at 8. He was the leader of years-long mortgage and foreclosure fraud conspiracies. He violated the terms of his pretrial release. He did not express remorse throughout his court proceedings. While he did not qualify for an offense level decrease under U.S.S.G. § 3E1.1, *see* PSR ¶ 41, the court was careful to not penalize Head for exercising his constitutional right to a trial. The above reasons, not Head's rejection of a plea offer, factored into the court's determination of the length of his sentence. *See id.* at 4–5; *see also, e.g.*, J. & Sentence Tr. at 50:10–56:10, ECF No. 1058 ("It is important that the Court attempt to avoid unwarranted disparities, to make certain, all things considered, that I'm treating Mr. Head equally and fairly under the law."). Head has not

presented anything with his current motion that causes the court to reconsider its determination that "the appropriate sentence for Head's crimes was 420 months." *Id.* at 5.

In sum, neither Head's family circumstances nor the length of his sentence constitutes an extraordinary or compelling reason for his early release.

### B.     § 3553 Factors

Even if Head demonstrated an extraordinary and compelling reason for release, most factors in 18 U.S.C. § 3553(a) weigh against him. The relevant factors include (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed and (4) the need to protect the public from further crimes. *See id.* § 3553(a)(1)–(2). The court undertook an extensive analysis of these factors in its 2022 order denying Head compassionate release and incorporates its analysis by reference here. *See* Order (June 7, 2022) at 3–8. Though it is not necessary to reexamine these factors, the court does so here. *See United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021) (holding "a district court that properly *denies* compassionate release need not evaluate each step") (emphasis in original).

First, the nature and circumstances of his offense remain the same. The underlying crimes were extremely serious. As explained in the court's 2022 order, Head and his financial schemes resulted in a loss of tens of millions of dollars. *See* Order (June 7, 2022) at 4. These conspiracies, though non-violent, devastated many lives. *See id.*; PSR ¶ 18. The victims of his fraudulent mortgage schemes continue to suffer from the effects of the financial devastation Head created. Several of those affected have submitted new victim impact statements in response to Head's motion for compassionate release. *See* Opp'n Ex. 2, ECF No. 1921-1. This factor continues to weigh against Head's early release.

Second, the history and characteristics of the defendant also remain the same. Head again argues that the dismissal of his conviction of possession of an assault rifle and the Pennsylvania charges of promoting prostitution, criminal conspiracy and possessing instruments of crime warrant a reduction in his sentence. Mot. at 27–29; *see generally* PSR ¶ 54. The reasoning in the court's 2022 order still stands. Factoring in the dismissal of these charges at the time of sentencing would not have changed the Guidelines' recommendation of life imprisonment. Order

11

1  (June 7, 2022) at 5 (explaining the "relevant 2013 Sentencing Table recommends life
2  imprisonment for anyone with a total offense level of at least 43" and Head's offense level of
3  forty-seven was unaffected by the dismissed charges). Moreover, the court did not rely on these
4  charges in making its ultimate sentencing decision. *Id.* Head's argument that his criminal history
5  and characteristics warrant early release is unpersuasive. This factor weighs against
6  compassionate release.

7  Third, the court considers the length of Head's sentence. Head has served approximately
8  172 months of his original 420-month sentence. This is roughly forty-one percent of his total
9  sentence. This is less than the 240-month sentence originally offered in a plea agreement by the
10  government, the 420-month sentence Head received after two juries found him guilty and the
11  180-year maximum calculated using the Sentencing Guidelines. *See* Mot. at 25; J. & Sentence
12  Tr. at 10:6–7, 56:11–20. Reducing Head's sentence by almost sixty percent would not reflect the
13  seriousness of his offense, promote respect for the law or provide just punishment. 18 U.S.C.
14  § 3553(a)(2)(A). If Head continues to accrue good conduct time credits, he may be eligible for
15  prerelease custody by October 2030. *See* Mot. at 23; Mot. Ex. A at 7, ECF No. 1914-1.
16  Additionally, the court does not find that there is a disparity between Head's and his
17  codefendants' sentences. The court has addressed Head's sentencing disparity argument on
18  numerous occasions and, here as well, he presents nothing new to cause the court to reconsider
19  the appropriateness of the sentence it imposed. Order (June 7, 2022) at 5; *see also* J. & Sentence
20  Tr. at 55:1–9. For these reasons, the court finds the length of Head's sentence and the time
21  remaining does not weigh in favor of compassionate release.

22  Finally, the court looks to the need to protect the public from any further crimes. As
23  described above, Head's crimes were non-violent. During his 172 months in prison, Head has
24  received five minor disciplinary infractions. Mot. Ex. J, ECF No. 1914-1. His last infraction
25  occurred over three years ago. *Id.* Head commendably has a positive history of rehabilitation,
26  including positive work reviews, enrollment in various educational courses and employment at
27  FCI Englewood's law library. *See* Mot. Exs. H–I, K, ECF No. 1914-1; Reply Ex. H, ECF

1  No. 1929-8.  Moreover, his PATTERN score is -1, indicating a low risk of reoffending.  Mot. Ex.
2  H at 45.  This indicates 18 U.S.C. § 3553(a)(2)(B)–(C) weighs in favor of Head.
3        On balance, three out of the four relevant sentencing factors weigh against granting
4  Head's motion for compassionate release.  Thus, because the court finds that Head does not
5  present an extraordinary and compelling reason for release and because the relevant sentencing
6  factors weigh against early release, the court denies Head's motion for compassionate release.

7  **IV.    REQUEST TO SEAL MEDICAL RECORDS**

8        Along with filing his motion for compassionate release, Head requests the medical records
9  of his family members, labeled as Exhibits P–V, be sealed.  Notice of Req. to Seal, ECF
10 No. 1915.  Because these exhibits detail sensitive information of vulnerable populations, the court
11 finds there is a compelling justification to seal the requested exhibits.
12       "[T]he courts of this country recognize a general right to inspect and copy public records
13 and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*,
14 435 U.S. 589, 597 (1978) (footnotes omitted).  Although that right is not absolute, "'a strong
15 presumption in favor of access' is the starting point." *Kamakana v. City & Cty. of Honolulu*,
16 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*,
17 331 F.3d 1122, 1135 (9th Cir. 2003)).  This presumption "is 'based on the need for federal courts,
18 although independent—indeed, particularly because they are independent—to have a measure of
19 accountability and for the public to have confidence in the administration of justice.'" *Ctr. for*
20 *Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *United States v.*
21 *Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).
22       This presumption can be overcome, especially in cases where personal medical
23 information is at risk of exposure.  *See, e.g.*, *United States v. Macken*, No. 20-CR-00023,
24 2024 WL 1443558 (E.D. Cal. Apr. 3, 2024) (granting defendant's request to file documents
25 "contain[ing] sensitive and private medical information" under seal); *United States v. Morales*,
26 No. 16-CR-00241, 2023 WL 6796467 (E.D. Cal. Oct. 13, 2023) (granting defendant's motion to
27 seal because "the subject of [her] medical records ha[d] a strong interest in confidentiality, which

. . . outweigh[ed] the public's interest in access"); *Chester v. King*, No. 16-CV-01257, 2019 WL 5420213 (E.D. Cal. Oct. 23, 2019) (collecting cases).

The court has considered the factors set forth in *Oregonian Publishing Company v. United States District Court for the District of Oregon*, and finds Head has met his burden of overcoming the strong presumption in favor of public access to judicial records. 920 F.2d 1462, 1466 (9th Cir. 1990) (factors are "(1) closure serves a compelling interest; (2) there is a substantial possibility that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives that would adequately protect the compelling interest") (citing *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 13–14 (1986)); *see Kamakana v. City of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).

Head's argument that filing these documents under seal is appropriate because they "contain sensitive and confidential psychological information of a minor, and medical information" is persuasive. Notice of Req. to Seal at 1. This court has consistently recognized "the need to protect medical privacy qualifies as a 'compelling reason' for sealing records." *Chester*, 2019 WL 5420213, at *2. These exhibits discuss the medical histories of Mr. Head, Mrs. Head and J.H. in extensive detail. If left unsealed, their medical privacy would be compromised. The court also finds there are no alternatives to sealing that would adequately protect these compelling interests. These exhibits present hundreds of pages of personal health information. Limited redaction would not preserve the privacy of the Heads as warranted here. Therefore, the court grants defendant's request to seal Exhibits P–V to his motion for compassionate release.

## V.    CONCLUSION

Head's motion for compassionate release, *Head I* ECF No. 1914 and *Head II* ECF No. 1144, is **denied.**

Head's request to seal Exhibits P–V to his motion for compassionate release, *Head I* ECF No. 1915 and *Head II* ECF No. 1145, is **granted**.

/////

14

1    This order resolves ECF Nos. 1914, 1915, 1144 and 1145.

2    IT IS SO ORDERED.

3    DATED: August 4, 2025.

_____
UNITED STATES DISTRICT JUDGE